**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| Martha Walther, Trent Kumfer, and Jayme Lea, as representatives of a class of similarly situated persons, and on behalf of the 80/20, Inc. Employee Stock Ownership Plan, | Case No. 1:23-cv-00294 |
|      Plaintiffs, | **COMPLAINT** |
| v. | **CLASS ACTION** |
| John Wood, Brian Eagle, MPE Partners II, L.P., and MPE Partners III, L.P., | |
|      Defendants. | |

## NATURE OF THE ACTION

1.      Plaintiffs Martha Walther, Trent Kumfer, and Jayme Lea ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the 80/20, Inc. Employee Stock Ownership Plan (the "ESOP"), bring this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants John Wood, Brian Eagle, MPE Partners II, L.P., and MPE Partners III, L.P. (collectively "Defendants"). As described herein, Defendants John Wood and Brian Eagle violated their ERISA fiduciary duties by failing to exercise or enforce the ESOP's right to buy 80/20, Inc. shares from the company founder's estate. They further violated ERISA by divesting the ESOP from the company altogether for less than fair value in a deal that benefited company leadership at the expense of the ESOP. Defendants MPE Partners II, L.P. and MPE Partners III, L.P. acquired the company's equity knowing that their bargain was the result of their co-Defendants' violations of ERISA. Plaintiffs seek damages, ill-gotten gains, and equitable remedies on behalf of the ESOP and Class.

**INTRODUCTION**

2.      Don Wood founded 80/20, Inc. (hereinafter "80/20" or "the company") in Fort Wayne, Indiana in 1986. Defendant John Wood, his son, worked for the company in the early years and is sometimes credited as a co-founder.

3.      The company manufactures patented building components known as The Industrial Erector Set. From modest beginnings, by 2016, the company grew to be an economic powerhouse in Northeast Indiana. The company employs around 400 workers at its 300,000 square foot campus in Columbia City, Indiana.

4.      Don Wood's dream was that 80/20 employees would own the company. In 2016, he willed the ESOP the right to buy his 80/20 stock after his death. He then sold 10% of the company to the ESOP *inter vivos*.

5.      In 2019, Don Wood died. At that time, he owned all or nearly all 80/20 stock not already owned by the ESOP, and his shares passed to his estate. He never modified or revoked the ESOP's right to buy his shares from his estate.

6.      After stepping away from the company for more than a decade, John Wood returned as chairman of the board shortly before his father's death. He continued to act as chairman after his father's death. In that position, John Wood acted as a fiduciary of the ESOP alongside Indianapolis attorney Brian Eagle, the ESOP's independent trustee.

7.      During Don Wood's life, the company prepared ESOP participants to take full ownership of 80/20. After Don Wood died, it was in participants' interest to increase the ESOP's investment in the successful company they helped build. Accordingly, Defendants Wood and Eagle had a fiduciary duty to exercise and enforce the ESOP's right to buy 80/20 shares from Don Wood's estate. Instead, they allowed company leadership and private equity investors,

Defendants MPE Partners II, L.P. and MPE Partners III, L.P. (hereinafter "MPE"), to execute a leveraged buyout of the company from the estate and the ESOP at a bargain, shorting the ESOP on its 10% share and diverting value from the ESOP to company leadership and MPE.

8.    Defendants Wood and Eagle violated their ERISA fiduciary duties. Defendant Wood failed to make a diligent effort to buy the estate's shares on behalf of the ESOP because he had a conflict: he disagreed with his father's belief that the ESOP should own the company. As independent trustee, Defendant Eagle had a duty to ensure that conflicts within the company did not interfere with the rights of the ESOP. He ceded the ESOP's rights under Don Wood's will in deference to Defendant Wood and company leadership, in breach of his standard of care.

9.    Defendants Wood and Eagle also violated their ERISA fiduciary duties by approving the terms of the MPE deal on behalf of the ESOP. MPE negotiated a below market price from Don Wood's estate and bought leadership's complicity by granting them bonuses and equity in the company. Defendants Wood and Eagle caused the ESOP to tag along on the same below market terms and failed to conduct an adequate independent investigation of the deal. The deal structure and benefits for leadership also violated ERISA's prohibited transaction rules. The net effect: the ESOP's proceeds were less than fair market value for the ESOP's shares.

10.    ERISA bars outside parties from knowingly profiting from fiduciary violations. Defendant MPE unlawfully took advantage of Wood and Eagle's ERISA violations.

11.    Because Defendants did not protect the ESOP's rights, Plaintiffs must do so. Defendants Wood and Eagle are liable to the ESOP and the Class for damages for lost investment opportunity, losses on the sale of ESOP shares, sale proceeds diverted to company leadership, and any ill-gotten gains. Additionally, the ESOP and Class are entitled to an equitable lien or constructive trust on income distributions and capital gains received by or owed to MPE.

## JURISDICTION AND VENUE

12.    Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

13.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the ESOP was administered in this district and several of the fiduciary breaches occurred in this district.

## PARTIES

### *Plaintiffs*

15.    Plaintiff Martha Walther is a natural person residing in Claypool, Indiana. She worked for 80/20 between 2013 and June 2021 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been worth more had Defendants not violated ERISA as set forth herein.

16.    Plaintiff Trent Kumfer is a natural person residing in Columbia City, Indiana. He worked for 80/20 between 2011 and July 2021 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. His account would have been worth more had Defendants not violated ERISA as set forth herein.

17.    Plaintiff Jayme Lea is a natural person residing in Columbia City, Indiana. She worked for 80/20 between 2015 and March 2020 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been worth more had Defendants not violated ERISA as set forth herein.

*The ESOP*

18.     Plaintiffs sue derivatively on behalf of the ESOP pursuant to 29 U.S.C.

§§ 1109(a) and 1132(a)(2).[1]

19.     The ESOP was established effective January 1, 2016, by 80/20. It was

administered at 80/20's headquarters in Columbia City, Indiana.

20.     The ESOP is an "employee pension benefit plan" within the meaning of 29 U.S.C.

§ 1002(2)(A); an "individual account plan" as defined by 29 U.S.C. § 1002(34) (also known as

"defined contribution plan"); and an "employee stock ownership plan" as defined by 29 U.S.C.

§ 1007(d)(6).

21.     The ESOP's participants were 80/20 employees who met minimum age and

service requirements prior to the ESOP's termination as a result of the MPE deal. 80/20 was thus

the ESOP "employer" within the meaning of 29 U.S.C. § 1002(5). As the ESOP employer, 80/20

was a party in interest within the meaning of 29 U.S.C. § 1002(14)(C).

22.     The purpose of the ESOP was to allow 80/20 employees to beneficially own

company stock and receive retirement benefits based on the company's value. On January 1,

2017, the ESOP acquired 10% of 80/20 stock.

23.     The ESOP was controlled by the company's directors and the independent trustee

appointed by the directors. Plaintiffs and ESOP participants had no authority to act on behalf of

the ESOP in any acquisition or sale transaction, or to buy or sell company shares individually.

Instead, they relied on the directors and the trustee to act on their behalf through the ESOP.

24.     Participants were allocated shares to their individual accounts in the ESOP by the

trustee based on procedures defined in the ESOP's governing documents. Upon a qualifying

---

[1] To the extent that any relief sought in this action is not available under 29 U.S.C. § 1109(a) and 1132(a)(2), Plaintiffs alternatively and additionally seek relief pursuant to 29 U.S.C. § 1132(a)(3).

event such as retirement, participants could tender their shares to the company for redemption and distribution of the proceeds.

25.     As a requirement of the MPE deal, the ESOP was terminated, and all ESOP shares were redeemed by the company. All account balances were distributed to participants during 2021 and 2022.

*Defendants*

26.     Defendant John Wood is a natural person residing in Hickory Corners, Michigan. He was chairman of 80/20's board from the fall of 2018 through the closing of the MPE deal in March 2021. As chairman of the sponsoring company's board, Wood exercised ultimate discretion and control with respect to the ESOP. He was responsible for directing or approving any acquisition or sale of company stock by the ESOP, or appointing and monitoring others to do so. He therefore acted as a "fiduciary" of the ESOP within the meaning of 29 U.S.C. §§ 1002(21)(A)(i) & (iii). He was also a party in interest to the ESOP pursuant to 29 U.S.C. § 1002(14)(H).

27.     Defendant Brian Eagle is a natural person residing in Fishers, Indiana. He served as the ESOP's independent trustee from the inception of the ESOP in 2016 through the closing of the MPE deal in March 2021. As independent trustee, Eagle held the ESOP's company stock in trust. No sale of the ESOP's stock could proceed without his approval. He also had authority to purchase additional company stock on behalf of the ESOP. He therefore acted as a fiduciary of the ESOP within the meaning of 29 U.S.C. §§ 1002(21)(A)(i) & (iii).

28.     Defendants MPE Partners II, L.P and MPE Partners III, L.P. are limited partnerships organized under the laws of the state of Delaware. MPE acquired a controlling equity position in 80/20 in March 2021 and still owns a controlling equity position.

*80/20 Leadership*

29.     Members of 80/20's leadership, including officers, directors, and management, were parties in interest to the ESOP within the meaning of 29 U.S.C. § 1002(14)(H). Members of 80/20's leadership received equity interests in the company and bonuses in the MPE deal.[2]

## FACTUAL ALLEGATIONS IN SUPPORT OF PLAINTIFFS' CLAIMS

*Company Origins and Don Wood's Will*

30.     Don Wood was an entrepreneur, toolmaker, and salesman.

31.     In 1986, Don Wood incorporated 80/20 in Fort Wayne, Indiana.

32.     Don Wood's vision for 80/20 was to create a company that could provide adjustable, modular machine building solutions to the automation industry. The result was a catalog of unique framing structures and fasteners designed and manufactured by the company, the core components of which are protected by patents owned by the company.

33.     Don Wood also developed sales and service teams to help customers imagine and implement customized uses for 80/20's products. The company developed its trademark, The Industrial Erector Set, in its first few years. The company used its distinctive brand and focus on sales and service to inspire new applications for 80/20 products in a range of industries.

34.     The company was successful. By 2016, the company had grown to around 400 employees and occupied more than 300,000 square feet of manufacturing and office space in Columbia City, Indiana.

35.     Don Wood's three sons, Defendant John Wood and two other sons, helped him to develop 80/20 in the early years and are sometimes credited as co-founders. His sons left the

---

[2] Details of the allocation of equity interests to individual members of 80/20's leadership team are not available to Plaintiffs at this stage. Accordingly, Plaintiffs have not named individual leadership team members as Defendants in relation to their receipt of improper benefits, but Plaintiffs may do so after discovery.

company at different times. As of July 2016, Don Wood was the President, sole Director, and sole voting shareholder of 80/20.

36.    On July 29, 2016, Don Wood republished his will, adding a new clause related to disposition of his interest in 80/20 upon his death:

> I appoint LAKE CITY BANK, or its successor in interest, as my personal representative. If my estate owns an interest in 80/20, Inc., it is my intent that said interest be sold and I direct the personal representative of my estate to take all actions necessary to sell said interest in a commercially reasonable manner. **In any such sale my preference would be to sell 80/20, Inc. to an employee stock ownership plan for the benefit of the employees of 80/20, Inc.**, and alternatively to a third-party purchaser.

(emphasis added).

37.    The language of Don Wood's will—granting a "preference" to an 80/20 employee stock ownership plan in the sale of his shares—conferred upon the ESOP an enforceable right to purchase his stock from his estate that was equal or akin to a right of first refusal or right of preemption.

*The ESOP*

38.    Don Wood formalized the ESOP during 2016. He caused the ESOP to be effective as of January 1, 2016. He appointed Defendant Eagle as independent trustee. And on January 1, 2017, he caused the company to sell 10% of its stock to the ESOP, which Defendant Eagle agreed to purchase on behalf of the ESOP as trustee.

39.    In order to finance the transaction, the company took out a loan, and the ESOP used the proceeds of the loan to buy 10% of 80/20's stock. In exchange for use of the loan proceeds, the ESOP agreed to repay the company in installments, which would be funded by stock dividends and tax-deductible contributions from the company to the ESOP. This is a common method used to finance equity transfers to ESOPs.

40.     The ESOP was cause for celebration at 80/20. Don Wood commissioned an "ESOP Communication Committee," of which Plaintiffs were members. The ESOP Communication Committee's mandate was to rally employees around the virtues of employee ownership.

41.     The company's message to employees was a mix of gratitude, duty, and motivation. The company characterized the ESOP as a reward for making the company so valuable. The company admonished employees that being an owner brought special responsibilities to the company and each other. The company instructed employees to take care of the company as their own property and work with a "servant heart" to benefit the collective. And the company told employees that the ESOP would one day own 100% of the company— motivation to bring the company to new heights and invest their careers in 80/20.

42.     The company's messaging campaign around the ESOP was successful. Employees took pride in the ESOP and bought into the company's message that the ESOP would expand its position over time.

*Don Wood's Death*

43.     Don Wood died in March 2019.

44.     At the time of his death, Don Wood continued to own all or substantially all 80/20 shares not owned by the ESOP.

45.     A week later, the company hosted a celebration of life ceremony at company headquarters attended by many employees.

46.     At the celebration of life ceremony, Don Wood's son Dave Wood announced that the company would be sold to the ESOP. His statements were then printed and distributed to all employees in the company newsletter.

*MPE Deal*

47.     On or around March 2, 2021, company leadership gathered employees for an announcement. They introduced representatives from MPE and revealed that the company had been sold to MPE.

48.     Employees reacted to the announcement with silence and exchanged confused looks. They had expected to be told that *the ESOP* had completed its planned acquisition of the company. Instead, they heard the opposite—the ESOP would be terminated and would not own any part of the company going forward.

49.     Company leadership guided the company toward the MPE deal in secret. Certain terms of the deal have since been revealed or may be inferred through public statements by MPE, filings by the ESOP with the Department of Labor (DOL), filings by the company with the Indiana Secretary of State, and reports of Don Wood's foundation, which received his estate's residue after the sale of his equity to MPE. Other terms of the MPE deal cannot be known to Plaintiffs at this stage, as the deal documents have not been made public, and Plaintiffs did not receive copies or drafts of the deal.

50.     As a contingent part of the MPE deal, the company redeemed the ESOP's shares on February 24, 2021. The consideration provided for the ESOP's shares was based on the price for sale of the estate's interest in the company agreed to between MPE, company leadership, and Lake City Bank, as personal representative of Don Wood's estate.

51.     The reported consideration for the transfer of the ESOP's shares was $20.37 million. However, based on the ESOP's Income and Expense Statement filed with the DOL, it appears that $2.17 million of the reported consideration was a dividend on the shares owned by the ESOP, which was used to reduce debt still owed by the ESOP to the company for the

acquisition of the ESOP's shares in 2017. Thus, proceeds attributable to the transfer of the ESOP's shares back to the company in 2021 totaled $18.2 million.

52.     ESOP participants received around $10.1 million of the $18.2 million redemption value. The difference of around $8.1 million represented the ESOP's remaining debt to the company after the dividend paydown.

53.     Members of company leadership who engineered the deal in secret received bonuses upon closing the deal. Discovery will show that MPE granted the bonuses to leadership as consideration for their complicity in steering the acquisition to MPE and away from the ESOP and completing the redemption of the ESOP's shares. The bonuses represented value of the disposition of the ESOP's shares that should have been received by the ESOP but was instead diverted to company leadership.

54.     Defendants Wood and Eagle approved each aspect of the redemption transaction on behalf of the ESOP as board chair and independent trustee, respectively. ESOP participants were not invited to vote.

55.     As a result of the redemption transaction, Defendant Wood approved the termination of the ESOP.

56.     The next step in the MPE deal was the conversion of the company to an LLC. The company converted to an LLC two days after the redemption transaction on February 26, 2021.

57.     The final step in the MPE deal was completed on March 1, 2021. MPE and company leadership took control of the company's equity based on a valuation of the company of around $182 million. The majority equity position is owned by MPE, and members of company leadership took smaller equity positions.

58.     MPE financed a substantial portion of the deal through the company. In order to obtain necessary financing, company leadership cooperated with MPE and granted the lenders a first lien security interest in all 80/20 assets. Prior to the deal, 80/20 had virtually no debt.[3]

*Lack of Fiduciary Process Related to the ESOP's Acquisition Right*

59.     Defendants Wood and Eagle knew Don Wood's will granted the ESOP the right to buy his shares from his estate but failed to make a diligent effort to exercise or enforce that right on the ESOP's behalf.

60.     Defendants Wood and Eagle's failure to buy the estate's shares on the ESOP's behalf was not based on a prudent, objective assessment of the interest of ESOP participants. The company's sales and profitability were trending upward, and the company had virtually no debt. 80/20 stock was a prudent investment, and 80/20 workers showed a strong interest in expanding the ESOP's stake in the company. Employees attended ESOP-related events, asked frequent questions regarding the ESOP, and were committed to the culture of employee ownership that the company fostered at Don Wood's direction.

61.     Defendants Wood and Eagle's failure to buy the estate's shares on the ESOP's behalf also was not based on lack of resources. Defendants Wood and Eagle could have made an offer to the estate on the ESOP's behalf that was substantially equivalent—if not superior—in value to the MPE deal, had they made the effort. The ESOP's written terms allowed the ESOP to borrow funds to buy additional shares of the company. And just as MPE and company leadership did, Defendants Wood and Eagle could have offered a first lien security interest on all company assets as collateral. There are dozens of leveraged ESOP transactions each year that utilize the

---

[3] Although the ESOP still owed the company around $8.1 million related to funding for the 2017 share acquisition, *see supra* ¶ 52, the company had paid off the underlying loan several years prior to the MPE deal.

same structure, and legion advisors and lenders with ESOP experience were available to help structure a financing package and competitive offer on the ESOP's behalf.

62.     The commercial reasonability of a leveraged purchase of the company by the ESOP is demonstrated not only by the frequency with which such transactions are consummated, but also unique factors that made such a transaction particularly attractive in this case. In a typical leveraged ESOP transaction, the ESOP borrows money from the company in order to buy the company's outstanding shares through a loan typically paid off over a 20- to 40-year period. The company may use a combination of cash on hand, traditional bank financing, and subordinated notes to the selling shareholders or other investors to support the loan to the ESOP. The ESOP then repays the loan using the company's annual contributions to the ESOP, which provides tax benefits for the company.

63.     Companies with already-high levels of cash on hand and low levels of debt are particularly well-positioned to effectuate a leveraged ESOP transaction. A high-cash, low-debt customer profile increases the amount that senior lenders will loan the company and lowers the interest rate they will charge, thus making it easier for the post-transaction company to manage its debt payments. And a company whose selling shareholder is in a position to finance a portion of the sale with subordinated notes can more easily bridge any gap between the limit of available senior financing and the sale price.

64.     Each of these factors advantageously positioned the ESOP to purchase the estate's interest in 80/20. The company had over $50 million in excess cash on hand following Don Wood's death and virtually no debt or encumbrances, positioning the company to raise a substantial portion of the financing needed for the deal through a senior loan from a traditional lender at a low interest rate. Additionally, the ultimate beneficiary of the estate's 80/20 sale was

the beneficiary of the estate's residue, Don Wood's private foundation. Like most charities, the foundation has a long time horizon for investments and focuses on income as its investment objective, spending less than 10% of assets each year on grants and operating expenses. It was thus consistent with the foundation's financial objectives to receive a portion of the sale proceeds in the form of subordinated notes, which would have earned 10%-12% interest based on typical rates for subordinated debt of ESOP companies at the time. The foundation could have used the income from the notes to support its grantmaking initiatives and pay operating expenses while preserving the foundation's principal assets.[4]

65.     Rather than a problem with the ESOP's interest or capacity to pursue the deal, Defendant Wood failed to exercise or enforce the ESOP's rights under Don Wood's will due to a conflict of interest and lack of care on his part. Defendant Wood was away from the company for more than a decade before reluctantly returning as chairman at the end of Don Wood's life pursuant to the company's succession plan. John Wood did not support the employee ownership culture that the company built in his absence and disagreed with his father's will that the ESOP should own the company. He resented having to return to the company and sought to minimize his responsibilities. But rather than appoint qualified agents or advisors to assist him in satisfying his fiduciary duties with respect to the ESOP, he abdicated his fiduciary duties and allowed the ESOP's rights under Don Wood's will to lapse.

66.     Defendant Eagle failed to exercise or enforce the ESOP's rights under Don Wood's will due to lack of care. Independent ESOP trustees typically act based on directions from company leadership, but independent trustees may not carry out instructions that are contrary to ERISA. Independent trustees also must conduct an independent investigation to

---

[4] There was also a market for subordinated notes of ESOP companies, allowing the foundation to sell the notes for cash and pursue other investments or uses at any time if its objectives changed.

support any course of action within their control, especially if other fiduciaries involved in the decision are conflicted. Defendant Wood and company leadership were conflicted with respect to whether to exercise or enforce the ESOP's rights under Don Wood's will. But rather than make an independent effort to exercise the ESOP's rights, Defendant Eagle deferred to Defendant Wood and company leadership and did not pursue the acquisition on behalf of the ESOP, allowing the ESOP's rights to lapse.

*Prohibited Transactions and Lack of Fiduciary Process Related to the Redemption of the ESOP's Shares*

67.     Defendants Wood and Eagle knew that the company's redemption of the ESOP's shares violated ERISA's prohibited transaction rules because the company was a party in interest to the ESOP.

68.     Defendants Wood and Eagle also knew that the redemption of the ESOP's shares was intended to benefit company leadership members—all parties in interest to the ESOP— through bonuses and equity interests in the post-ESOP company, in further violation of ERISA's prohibited transaction rules.

69.     Defendants Wood and Eagle approved the redemption transaction notwithstanding the prohibited transaction between the ESOP and the company and the prohibited benefits for company leadership.

70.     Defendants Wood and Eagle failed to conduct an adequate independent investigation to determine if the price was fair to the ESOP.

71.     Had Defendants Wood and Eagle conducted an adequate investigation, they would have discovered that the price was a bargain engineered to allow MPE and company leadership to take control of the company's equity at less than fair market value.

72.    Based on consideration received by the ESOP for the transfer of its shares, the MPE deal valued the company at around $182 million. The company's financial results known to Plaintiffs and the valuation of comparable companies at the same time demonstrate that this sale price undervalued the company.

73.    Plaintiffs estimate that 80/20 had approximately $105 million in sales in 2020, based on historic revenue and growth rates.[5] The average machinery company at the time was worth 3.06 times its sales—supporting a $321 million valuation of 80/20 at the time of the MPE deal.[6] This is confirmed by valuations of companies within the "general industrial machinery and equipment" category, which showed that the median company was worth 3.32 times its sales—supporting a $349 million valuation of 80/20.[7]  Had the ESOP received fair consideration for its shares in line with the company's fair market value, ESOP participants would have received around 15 million more in distributions upon termination of the ESOP.[8]

74.    Wood and Eagle's failure to obtain a price in line with the company's fair market value gives rise to an inference of either a failure of care and diligence, whereby they failed to conduct a thorough effort to get the best price for the ESOP's shares, or a failure of loyalty, whereby they accepted a below market value price for 80/20 because company leadership was compensated in other ways that the ESOP was not, such as equity in the new company or bonus

---

[5] Revenue data yields useful valuation estimates when comparing companies in the same industry because companies within the same industry tend to have similar profit margins.
[6] Damodaran Online, compiled by NYU Prof. of Finance Aswath Damodaran, PhD, MBA, Price and Enterprise Value to Sales Ratios by Industry Sector (Jan. 2021), available at https://pages.stern.nyu.edu/~adamodar/pc/archives/psdata20.xls (archived at https://pages.stern.nyu.edu/~adamodar/New_Home_Page/dataarchived html) (last accessed July 7, 2023).
[7] eVal U.S. Valuation Multiples by Industry, Manufacturing (March 2021), *available at* https://www.eval.tech/valuation-multiples-by-industry/2021/Manufacturing-Mar21.pdf (archived at https://www.eval.tech/valuation-multiples-by-industry) (last accessed July 7, 2023).
[8] Plaintiffs' market comparison is based on enterprise value—the value of comparable companies on a debt free basis. This comparison is apt because 80/20 had virtually no debt. But even accounting for the debt of comparable machinery companies, the revenue multiple should have been around 2.68 (*see* fn. 6), supporting a price that would have yielded an addition $10 million in distributions to ESOP participants.

compensation. *See supra* ¶ 29; *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009) (evidence that participants paid higher fees than were available in the marketplace gives rise to an inference that "the process by which [the fiduciaries] selected and managed the funds in the Plan would have been tainted by failure of effort, competence, or loyalty").

*MPE's Liability*

75.     MPE knew that Don Wood's will granted the ESOP the right to buy the estate's shares. The very same document that established Lake City Bank's authority to sell the shares established the ESOP's right to buy them.

76.     MPE knowingly interfered with the ESOP's rights under Don Wood's will by offering company leadership equity and bonuses to facilitate its acquisition of the estate's shares.

77.     MPE further knowingly interfered with the ESOP's rights by inducing company leadership to facilitate the redemption of the ESOP's stake in the company for less than fair market value for MPE's benefit.

78.     MPE knew that Defendants Wood and Eagle violated their fiduciary duties to the ESOP by failing to exercise or enforce the ESOP's right to acquire the estate's shares.

79.     MPE also knew that Defendants Wood and Eagle violated their fiduciary duties to the ESOP by approving the redemption of ESOP shares by the company for less than fair value and the resulting benefits to company leadership.

80.     MPE received substantial benefits from the deal in the form of its equity interest in the company and subsequent profits distributions, realized and unrealized gains, and other rights of ownership. MPE knew that it received these benefits due to its own efforts to interfere with the ESOP's rights and due to Defendants Wood and Eagle's violations of ERISA.

## PLAN-WIDE RELIEF

81.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the ESOP pursuant to this statutory provision (in addition to 29 U.S.C. § 1132(a)(3)).

82.    Plaintiffs seek recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches and seek equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

83.    Plaintiffs are adequate to bring this derivative action on behalf of the ESOP, and their interests are aligned with other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the ESOP.

## CLASS ACTION ALLEGATIONS

84.    Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

85.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the ESOP defined as follows:

> All participants and beneficiaries of the ESOP at the time of its termination, excluding any Defendant or employee of 80/20 who received an equity interest in the company or a bonus as a result of the MPE deal.

86.    Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had around 350 participants.

87.    <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were ESOP participants, and Plaintiffs suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

88.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

89.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.    Whether Defendants Wood and Eagle were fiduciaries with respect to the ESOP;

b.    Whether Defendants Wood and Eagle had a fiduciary duty to exercise or enforce the ESOP's rights under Don Wood's will;

c.    Whether the redemption of the ESOP's shares benefited parties in interest to the ESOP through equity interests in the post-ESOP company and bonuses;

d.    Whether the ESOP received adequate consideration for its shares;

e.    Whether the ESOP's fiduciaries failed to comply with the fiduciary standards of prudence and loyalty;

      f.     Whether MPE knowingly participated in ERISA violations by the ESOP's fiduciaries;

      g.     The proper form of equitable and injunctive relief; and

      h.     The proper measure of monetary relief.

90.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members.

91.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as granting interests in specified property to the ESOP or ESOP participants, would be dispositive of the interests of all participants.

92.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing individual actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice

and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single case.

93.     Plaintiffs and their undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

### CAUSES OF ACTION

### Count I
### 29 U.S.C. § 1106(a)
*Against Defendants Wood and Eagle*

94.     Plaintiffs incorporate Paragraphs 1–93 by reference.

95.     The redemption of the ESOP's shares by the company violated 29 U.S.C. § 1106(a)(1)(A) & (D) because the company was a party in interest to the ESOP.

96.     The redemption of the ESOP's shares by the company also violated 29 U.S.C. § 1106(a)(1)(A) & (D) because the transaction constituted the use of ESOP assets for the benefit of members of company leadership, and the indirect transfer of ESOP assets to company leadership, each of whom was a party in interest to the ESOP.

97.     Defendants Wood and Eagle caused these prohibited transactions in their capacities as the ESOP fiduciaries responsible for approving the redemption transaction on behalf of the ESOP.

98.     The company's financial results and comparable market valuations show that the consideration provided for the ESOP shares in the redemption transaction was inadequate and below fair market value.

99.     Defendants Wood and Eagle caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses. If discovery shows that Defendant Wood was one of the members of company leadership who benefited from the

MPE deal through receipt of equity interests in the company, bonuses, or other consideration, Defendant Wood is also liable for any gains and other equitable relief.

### **Count II**
### **29 U.S.C. § 1104(a)(1)**
### *Against Defendants Wood and Eagle*

100.    Plaintiffs incorporate Paragraphs 1–93 by reference.

101.    Defendants Wood and Eagle, as board chair and ESOP trustee, were responsible for exercising and enforcing the ESOP's right under Don Wood's will to buy his shares from his estate.

102.    Defendants Wood and Eagle, as board chair and ESOP trustee, were responsible for obtaining a fair price on behalf of the ESOP in the redemption of the ESOP's shares.

103.    Defendants Wood and Eagle failed to act prudently or solely in the interest of ESOP participants when they failed to exercise or enforce the ESOP's rights under Don Wood's will.

104.    Defendants Wood and Eagle failed to act prudently and solely in the interest of ESOP participants when they approved the ESOP redemption transaction without conducting an adequate independent investigation of the deal.

105.    Had Defendants Wood and Eagle performed their fiduciary duties in the prudent and loyal manner required by ERISA, the ESOP would have acquired additional shares from Don Wood's estate or received additional value for redemption of its shares.

106.    Defendants Wood and Eagle caused losses to the ESOP resulting from the above-mentioned fiduciary breaches and are liable to the ESOP for those losses. If discovery shows that Defendant Wood was one of the members of company leadership who benefited from the MPE

deal through receipt of equity interests in the company, bonuses, or other consideration,

Defendant Wood is also liable for any gains and other equitable relief.

**Count III**
**29 U.S.C. § 1132(a)(3)**
*Against MPE*

107.    Plaintiffs incorporate paragraphs 1-93 by reference.

108.    Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable

relief [] to redress [ERISA] violations[.]" Such "appropriate equitable relief" includes recovering

proceeds of a fiduciary violation from a knowing participant in the violation. *See Harris Trust v.*

*Solomon Smith Barney*, 530 U.S. 238 (2000).

109.    MPE knew that Defendants Wood and Eagle were fiduciaries obligated to enforce

the ESOP's rights under Don Wood's will and protect the ESOP in any acquisition of the

ESOP's shares. MPE knowingly and intentionally undermined Wood and Eagle's fiduciary

duties by offering improper benefits to company leadership to induce them to support MPE's

acquisition of the company from the estate and ESOP at a bargain. MPE knew that the resulting

deal violated Wood and Eagle's fiduciary duties.

110.    Pursuant to principles of equity, as adopted and applied by federal courts in

ERISA cases, MPE must be denied any benefit from its knowing participation in Wood and

Eagle's fiduciary violations against the ESOP.

**PRAYER FOR RELIEF**

111.    Wherefore, Plaintiffs pray for judgment against Defendants and for the following

relief:

A.    Certify Plaintiffs' authority to seek plan-wide relief on behalf of the ESOP
pursuant to 29 U.S.C. § 1132(a)(2);

B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ.
P. 23, certify Plaintiffs as class representatives, and certify their counsel as

23

class counsel;

C.       Order Defendants Wood and Eagle to make good to the ESOP all losses resulting from their violations of ERISA, and disgorge any gains;

D.       Impose an equitable lien or constructive trust for the benefit of the ESOP and the Class on income distributions and capital gains received by or owed to MPE based on its equity interest in the company, and order an accounting of such distributions and gains;

E.       Appoint an independent trustee to manage the collection of recovered sums, enforcement of equitable interests granted to the class, and the allocation and distribution of recovered benefits;

F.       Approve a fair and equitable plan of allocation of any recovered benefits to the Class;

G.       Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

H.       Award prejudgment and post-judgment interest; and

I.       Award such other and further relief as the Court deems just and equitable.

Dated: July 14, 2023                  Respectfully submitted,

**ENGSTROM LEE LLC**
/s/Jennifer K. Lee
Jennifer K. Lee, MN Bar No. 0399012*
Carl F. Engstrom, MN Bar No. 0396298^
Charles C. Gokey, MN. Bar No. 0402225^
729 N. Washington Ave., Suite 600
Minneapolis, MN 55401
Telephone: (612) 305-8349
jlee@engstromlee.com
cengstrom@engstromlee.com
cgokey@engstromlee.com

*Admitted in Northern District of Indiana
^Pro Hac Vice Motion Forthcoming

*ATTORNEYS FOR PLAINTIFFS*