**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| Martha Walther, Trent Kumfer, Jayme Lea, Megan Kelsey, Dave Lowe, Carol Whisler, and Michele Porter, as representatives of a class of similarly situated persons, and on behalf of the 80/20, Inc. Employee Stock Ownership Plan,<br><br>        Plaintiffs,<br><br>v.<br><br>John Wood, Brian Eagle, Patrick Buesching, Patrice Mauk, Rodney Strack, MPE Partners II, L.P., MPE Partners III, L.P., and Pareto Efficient Solutions, LLC,<br><br>        Defendants. | Case No. 1:23-cv-00294-HAB-SLC<br><br><br>**FIRST AMENDED COMPLAINT**<br><br>**CLASS ACTION** |

## NATURE OF THE ACTION

1.      Plaintiffs Martha Walther, Trent Kumfer, Jayme Lea, Megan Kelsey, Dave Lowe, Carol Whisler, and Michele Porter ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the 80/20, Inc. Employee Stock Ownership Plan (the "ESOP"), bring this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants John Wood, Brian Eagle, Patrick Buesching, Patrice Mauk, Rodney Strack, MPE Partners II, L.P., MPE Partners III, L.P., and Pareto Efficient Solutions, LLC (collectively, "Defendants"). Defendants Wood, Eagle, Buesching, Mauk, and Strack violated their ERISA fiduciary duties by failing to exercise or enforce the ESOP's rights to buy 80/20, Inc. shares from the company founder's estate. They further violated ERISA by divesting the ESOP from the company altogether in a deal that benefited themselves at the expense of the ESOP. Defendants MPE Partners II, L.P., MPE Partners III, L.P., through Pareto Efficient Solutions, LLC (collectively, the "MPE Defendants"), acquired the company's equity knowing that their bargain

1

was the result of their co-Defendants' violations of ERISA. Plaintiffs seek damages, ill-gotten gains, and equitable remedies on behalf of the ESOP and Class.

## INTRODUCTION

2.      Don Wood founded 80/20, Inc. ("80/20" or the "company") in Fort Wayne, Indiana in 1986. Defendant John Wood, his son, worked for the company in the early years and is sometimes credited as a co-founder.

3.      The company manufactures patented building components known as The Industrial Erector Set. From modest beginnings, by 2016, the company grew to be an economic powerhouse in Northeast Indiana. The company employs around 400 workers at its 300,000 square foot campus in Columbia City, Indiana.

4.      Don Wood's dream was that 80/20 employees would own the company. In 2016, he willed the ESOP the right to buy his 80/20 stock after his death. He then sold 10% of the company to the ESOP *inter vivos* and executed a buy-sell agreement requiring that, upon his death, his shares be offered to the ESOP at a specified price point.

5.      In 2019, Don Wood died. At that time, he owned all 80/20 stock not already owned by the ESOP, and his shares passed to his estate. He never modified or revoked the ESOP's rights to buy his shares after his death.

6.      After stepping away from 80/20 for more than a decade, Defendant Wood returned as chairman of the board shortly before his father's death. He continued to act as chairman after his father's death. In that position, Defendant Wood acted as a fiduciary of the ESOP responsible for appointing and monitoring the ESOP's independent trustee, Defendant Eagle, an Indianapolis attorney. In the same role, he was responsible for appointing and monitoring the 80/20 ESOP committee, including Defendants Buesching, Mauk, and Strack (the

"Officer Defendants"), who were 80/20's three highest-ranking executives and comprised a controlling ESOP committee majority.

7.      Defendant Wood also assumed control of the Don Wood Foundation (the "Foundation") following his father's death. The Foundation was the residual beneficiary of Don Wood's estate (the "Estate") and stood to receive the proceeds of the sale of his 80/20 shares to the ESOP. The Foundation directed the Estate in matters related to the disposition of that stock.

8.      After Don Wood died, Defendant Eagle began working with the Estate to finalize the deal for the ESOP to acquire control of the company. Defendant Eagle had a fiduciary duty to make diligent efforts to consummate the transaction between the Estate and the ESOP and to enforce the ESOP's rights to purchase the 80/20 stock held by the Estate.

9.      The deal never happened. Defendant Wood caused the Estate to refuse to honor the ESOP's right to buy its shares of 80/20 stock, and to instead offer that stock to the MPE Defendants. The Officer Defendants, through their control of the ESOP committee, directed Defendant Eagle to release the ESOP's acquisition rights and join the MPE deal as a seller. In exchange for their support, the Officer Defendants received ownership interests in Defendant Pareto (the buyer) and bonuses as part of the deal. Defendant Eagle failed to take any steps to protect or exercise the ESOP's rights in response to these unlawful actions by Defendant Wood and the Officer Defendants. And the MPE Defendants induced and exploited the unlawful conduct of their co-Defendants to acquire 100% of the company (the "MPE deal").

10.      Defendants Wood, Eagle, and the Officer Defendants violated their ERISA fiduciary duties in connection with their interference with and non-enforcement of the ESOP's rights to buy 80/20 shares from the Estate. The MPE Defendants knowingly participated in those violations of ERISA.

11.    Defendant Wood abused his power to appoint and monitor other ESOP fiduciaries to orchestrate his desired deal and cut off the ESOP's rights. He also acted in a capacity adverse to the ESOP, as director of the Foundation, while serving as an ESOP fiduciary, intending to cause the Estate and the company to violate their obligations to the ESOP. His motivations were personal: he disagreed with his father's belief that 80/20's employees should own the company.

12.    As members of the ESOP committee, the Officer Defendants interfered with and failed to protect the ESOP's rights. Rather than protect the ESOP, they caused it to sell its assets as part of a prohibited transaction in which they would personally benefit.

13.    Defendant Eagle failed to competently and diligently pursue the transaction between the Estate and the ESOP. He further failed to enforce the ESOP's rights when the deal was in jeopardy and later terminated. Rather than protect the ESOP, he deferred to Defendant Wood and the Officer Defendants, acceding to their unlawful directions. As a result, he approved the sale of the ESOP's shares and the release of its acquisition rights and claims in a transaction he knew to be unlawful.

14.    ERISA bars outside parties from knowingly profiting from fiduciary violations. The MPE Defendants unlawfully incentivized, induced, and took advantage of ERISA violations by Defendant Wood, the Officer Defendants, and Defendant Eagle, to their own profit.

15.    Because Defendants did not protect the ESOP's rights, Plaintiffs must do so. Defendant Wood, the Officer Defendants, and Defendant Eagle are liable to the ESOP and the Class for damages for lost investment opportunity, losses on the disposition of ESOP assets, and ill-gotten gains. Additionally, the ESOP and Class are entitled to an equitable lien or constructive trust on income distributions and capital gains received by or owed to the MPE Defendants.

**JURISDICTION AND VENUE**

16.    Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

17.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

18.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the ESOP was administered in this district and several of the fiduciary breaches occurred in this district.

**PARTIES**

*Plaintiffs*

19.    Plaintiff Martha Walther is a natural person residing in Claypool, Indiana. She worked for 80/20 between 2013 and June 2021 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been worth more had Defendants not violated ERISA as set forth herein. She was an ESOP committee member at the time the MPE deal closed. Unlike the ESOP committee majority (*i.e.*, the Officer Defendants), she was not given personal incentives in connection with the MPE deal. She was not aware of the personal incentives received by the Officer Defendants until after the deal closed, nor was she aware that the ESOP committee was given any discretion to reject the deal.

20.    Plaintiff Trent Kumfer is a natural person residing in Columbia City, Indiana. He worked for 80/20 between 2011 and July 2021 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. His account would have been worth more had Defendants not violated ERISA as set forth herein.

21.     Plaintiff Jayme Lea is a natural person residing in Columbia City, Indiana. She worked for 80/20 between 2015 and March 2020 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been worth more had Defendants not violated ERISA as set forth herein.

22.     Plaintiff Megan Kelsey is a natural person residing in Fort Wayne, Indiana. She is an 80/20 employee who began working for the company in July 2016. She had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been worth more had Defendants not violated ERISA as set forth herein.

23.     Plaintiff Dave Lowe is a natural person residing in Columbia City, Indiana. He was an 80/20 employee from August 2014 to June 2023 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. His account would have been worth more had Defendants not violated ERISA as set forth herein.

24.     Plaintiff Carol Whisler is a natural person residing in Columbia City, Indiana. She was an 80/20 employee from June 2017 to November 2023. She had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been worth more had Defendants not violated ERISA as set forth herein.

25.     Plaintiff Michele Porter is a natural person residing in Columbia City, Indiana. She is an 80/20 employee who began working for the company in 2011. She had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been worth more had Defendants not violated ERISA as set forth herein.

*The ESOP*

26.    Plaintiffs sue derivatively on behalf of the ESOP pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3).[1]

27.    The ESOP was established effective January 1, 2016, by 80/20. It was administered at 80/20's headquarters in Columbia City, Indiana. It was governed by written terms (the "plan document").

28.    The ESOP was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); an "individual account plan" as defined by 29 U.S.C. § 1002(34) (also known as "defined contribution plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6).

29.    The ESOP's participants were 80/20 employees who met minimum age and service requirements prior to the ESOP's termination as a result of the MPE deal. 80/20 was thus the ESOP "employer" within the meaning of 29 U.S.C. § 1002(5). As the ESOP employer, 80/20 was a party in interest within the meaning of 29 U.S.C. § 1002(14)(C).

30.    The purpose of the ESOP was to allow 80/20 employees to beneficially own company stock and receive retirement benefits based on the company's value. On January 1, 2017, the ESOP acquired 10% of 80/20 stock.

31.    The ESOP was controlled by the company's directors, who had authority to appoint an independent trustee and ESOP committee and direct them as to the scope and use of their powers.

32.    Participants were allocated shares to their individual accounts in the ESOP by the trustee based on procedures defined in the ESOP's governing documents. Upon a qualifying

---

[1] To the extent that any relief sought in this action is not available under 29 U.S.C. § 1109(a) and 1132(a)(2), Plaintiffs alternatively and additionally seek relief pursuant to 29 U.S.C. § 1132(a)(3).

event such as retirement, participants could tender their shares to the company for redemption and distribution of the proceeds. Outside of a qualifying event, ESOP participants could not individually elect to buy or sell shares.

33.    As a requirement of the MPE deal, the ESOP was terminated, and all ESOP shares were redeemed by the company. All account balances were distributed to participants during 2021 and 2022.

*Defendants*

34.    Defendant John Wood is a natural person residing in Hickory Corners, Michigan. He was chairman of 80/20's board from fall 2018 through the closing of the MPE deal in March 2021. Under the plan document, only the board could appoint or remove the ESOP trustee and ESOP committee. Defendant Wood therefore acted as a "fiduciary" of the ESOP under 29 U.S.C. §§ 1002(21)(A)(i) & (iii) at all times relevant to this action.[2] Defendant Wood was also a party in interest to the ESOP under 29 U.S.C. § 1002(14)(H). Defendant Wood additionally served as the chairman of the board of the Foundation between 2019 and 2021.

35.    Defendant Brian Eagle is a natural person residing in Fishers, Indiana. Pursuant to appointments authorized by 80/20's board, Defendant Eagle served as the ESOP's independent trustee from the inception of the ESOP in 2016 through the closing of the MPE deal in March 2021. Between the ESOP's inception and December 2, 2020, Defendant Eagle had discretionary authority to acquire company shares from the company or any shareholder on behalf of the ESOP and to finance any such acquisition. *See* ECF 37-1, Plan Document (Jan. 1, 2016) ¶ 6.09; ECF No. 37-3, Trust Agreement (Dec. 1, 2016) ¶ 2.03(g); ECF 37-4, Trustee Engagement

---

[2] The MPE deal documents confirm that the parties viewed the "responsibilities [under ERISA] of the Board of Directors of the Company as 'appointing fiduciaries'" to be separate and distinct from the fiduciary responsibilities allocated to the ESOP trustee. *See* ECF No. 40-1, Stock Redemption Agreement ¶ 4(f)(2).

Agreement (Feb. 3, 2020) ¶¶ 1, 3. Effective December 2, 2020, the board removed Defendant Eagle as the ESOP fiduciary authorized to buy shares on behalf of the ESOP and re-appointed him with powers limited to selling the ESOP's shares to the MPE Defendants. *See* ECF No. 37-5, Trustee Engagement Agreement (Dec. 2, 2020). In his limited appointment, Defendant Eagle was required to "exercise his independent discretionary judgment in connection with the . . . disposition of Trust assets in accordance with . . . ERISA" and "determin[e] after due diligence whether . . . [he] can, under applicable law, consummate" the MPE deal. *Id.* ¶¶ 1, 3. At all times, Defendant Eagle acted as a "fiduciary" of the ESOP. *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii).

36.     Defendant Patrick Buesching was the CEO of 80/20 between Don Wood's death and August 2021. He was also a Foundation board member during relevant times between 2019 and 2021. He was the chair of the ESOP committee at all relevant times between 2019 and 2021. He was also a member of the MPE Defendants through his membership interests in Pareto. At all relevant times, he acted as a "fiduciary" of the ESOP. *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii). He was also a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14) as a fiduciary of the ESOP and an officer of 80/20.

37.     Defendant Patrice Mauk was the CFO of 80/20 between Don Wood's death and the MPE deal, and continues to serve as CFO. She was a member of the ESOP committee at all relevant times between 2019 and 2021. She was also a member of the MPE Defendants through her membership interests in Defendant Pareto. At all relevant times, she acted as a "fiduciary" of the ESOP. *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii). She was also a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14) as a fiduciary of the ESOP and an officer of 80/20.

38.     Defendant Rodney Strack was the Executive Director of Sales ("EDS") of 80/20 between Don Wood's death and the MPE deal, and continues to serve as EDS. He was a member

of the ESOP committee at all relevant times between 2019 and 2021. He was also a member of the MPE Defendants through his membership interests in Defendant Pareto. At all relevant times, he acted as a "fiduciary" of the ESOP. *See* 29 U.S.C. §§ 1002(21)(A)(i) & (iii). He was also a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14) as a fiduciary of the ESOP and an officer and employee of 80/20.

39.    Defendants MPE Partners II, L.P and MPE Partners III, L.P. ("MPE Partners II and III") are limited partnerships organized under the laws of the state of Delaware that make equity investments in privately held companies. In March 2021, through the MPE deal, MPE Partners II and III acquired a controlling equity position in 80/20 through Defendant Pareto Efficient Solutions, LLC ("Pareto"), a Delaware limited liability company created by MPE Partners II and III in January 2021 for the sole purpose of acquiring and holding 80/20's equity for the benefit of MPE Partners II and III and their investors (including the Officer Defendants). MPE Partners II and III and Pareto are under common control by individuals associated with Morgenthaler Private Equity Partners.

## FACTUAL ALLEGATIONS IN SUPPORT OF PLAINTIFFS' CLAIMS

*Company Origins and Don Wood's Will*

40.    Don Wood was an entrepreneur, toolmaker, and salesman.

41.    In 1986, Don Wood incorporated 80/20 in Fort Wayne, Indiana.

42.    Don Wood's vision for 80/20 was to create a company that could provide adjustable, modular machine building solutions to the automation industry. The result was a catalog of unique framing structures and fasteners designed and manufactured by the company, the core components of which are protected by patents owned by the company.

43.    Don Wood also developed sales and service teams to help customers imagine and implement customized uses for 80/20's products. The company developed its trademark, The

10

Industrial Erector Set, in its first few years. The company used its distinctive brand and focus on sales and service to inspire new applications for 80/20 products in a range of industries.

44. The company was successful. By 2016, the company had grown to around 400 employees and occupied more than 300,000 square feet of manufacturing and office space in Columbia City, Indiana.

45. Don Wood's three sons, Defendant Wood and two other sons, helped him to develop 80/20 in the early years and are sometimes credited as co-founders. His sons left the company at different times. As of July 2016, Don Wood was the President, sole Director, and sole voting shareholder of 80/20.

46. On July 29, 2016, Don Wood republished his will, adding a new clause related to disposition of his interest in 80/20 upon his death:

> I appoint LAKE CITY BANK, or its successor in interest, as my personal representative. If my estate owns an interest in 80/20, Inc., it is my intent that said interest be sold and I direct the personal representative of my estate to take all actions necessary to sell said interest in a commercially reasonable manner. **In any such sale my preference would be to sell 80/20, Inc. to an employee stock ownership plan for the benefit of the employees of 80/20, Inc.**, and alternatively to a third-party purchaser.

(emphasis added).

47. The language of Don Wood's will—granting a "preference" to an 80/20 employee stock ownership plan in the sale of his shares—conferred upon the ESOP an enforceable right to purchase his stock from the Estate that was not less than a right of first refusal or right of preemption.

### The ESOP

48. Don Wood formalized the ESOP during 2016. He caused the ESOP to be effective as of January 1, 2016. He appointed Defendant Eagle as independent trustee. And on

11

January 1, 2017, he caused the company to sell 10% of its stock to the ESOP, which Defendant Eagle agreed to purchase on behalf of the ESOP as trustee.

49.    In order to finance the transaction, the company took out a loan, and the ESOP used the proceeds of the loan to buy 10% of 80/20's stock. In exchange for use of the loan proceeds, the ESOP agreed to repay the company in installments, which would be funded by stock dividends and tax-deductible contributions from the company to the ESOP. This is a common method used to finance equity transfers to ESOPs.

50.    In connection with the initial ESOP purchase transaction on January 1, 2017, Don Wood also entered into a buy-sell agreement with 80/20 providing a framework for the sale of the Estate's interest in 80/20 in the event of his death. The buy-sell agreement required the Estate to "offer . . . to sell all or any portion of the Shares owned by Donald F. Wood at his death to" the ESOP "at the ESOP Purchase Price" as defined in the agreement "upon the terms to be determined between Wood and the [ESOP]." Consistent with the preference rights codified in Don Wood's will, the buy-sell agreement restricted the sale of 80/20's stock to buyers other than the ESOP.

51.    Don Wood explained his decision to create the ESOP as follows in a press release hosted on the website of Defendant Eagle's law firm:

> The decision to shift ownership to the employees has been a dream of mine. It's a great feeling to see it come to fruition . . . . As stakeholders of the company, now all our employees can experience the responsibility and pride of being an owner.

52.    Don Wood personally let it be known widely among 80/20's employees that, consistent with his will and the buy-sell agreement, he intended for the ESOP to ultimately purchase more of the company.

53.     The ESOP was cause for celebration at 80/20. Don Wood commissioned an "ESOP Communication Committee," of which Plaintiffs Walther, Lea, and Kumfer were members. The ESOP Communication Committee's mandate was to rally employees around the virtues of employee ownership and prepare them to become full owners of the company.

54.     The company's message to employees was a mix of gratitude, duty, and motivation. The company characterized the ESOP as a reward for making the company so valuable. The company admonished employees that being an owner brought special responsibilities to the company and each other. The company instructed employees to take care of the company as their own property and work with a "servant heart" to benefit the collective. And at Don Wood's direction, the company repeatedly and consistently told employees that the ESOP would one day own 100% of the company—motivation to bring the company to new heights and invest their careers in 80/20.

55.     The company's messaging campaign around the ESOP was successful. Employees took pride in the ESOP and bought into the company's message that the ESOP would expand its position over time.

*Don Wood's Death*

56.     Don Wood died in March 2019.

57.     At the time of his death, Don Wood owned all 80/20 shares not owned by the ESOP.

58.     A week later, the company hosted a celebration of life ceremony at company headquarters attended by many employees.

59.     At the celebration of life ceremony, Don Wood's son Dave Wood acknowledged the rights of the ESOP under Don Wood's will and the buy-sell agreement, announcing that the

13

company would be sold to the ESOP. His statements were then printed and distributed to all employees in the company newsletter.

*The Sale of the Estate's Shares*

60.    Consistent with Don Wood's will and the buy-sell agreement, which both independently granted the ESOP a right to buy Don Wood's shares of 80/20 stock, the Estate and the ESOP began preparing the sale of the Estate's shares to the ESOP. The Estate acknowledged the ESOP's right to purchase 80/20 and initially proceeded on the understanding that it would offer to sell the ESOP all of the 80/20 stock held by Don Wood at his death.

61.    As part of the sale process, the ESOP agreed to be and did become bound by the terms of the buy-sell agreement along with the parties. The ESOP was party to modifications of the timelines set forth in the buy-sell agreement and was understood by the Estate and the company to have the right to enforce the buy-sell agreement.

62.    80/20 stock was a prudent—indeed, highly attractive—investment. The company's sales and profitability were trending upward, and the company had virtually no debt. Moreover, 80/20 workers showed a strong interest in expanding the ESOP's stake in the company. Employees attended ESOP-related events, asked frequent questions regarding the ESOP, and were committed to the culture of employee ownership that the company fostered at Don Wood's direction. It was in the best interests of the ESOP and its members for the ESOP to purchase the 80/20 stock held by Don Wood's estate.

63.    As the discretionary trustee of the ESOP for purposes of buying additional 80/20 shares from the Estate, Defendant Eagle had a fiduciary duty under ERISA to prudently and diligently pursue a deal on behalf of the ESOP and to assert the ESOP's rights to purchase the shares.

14

64.    As a board member responsible for appointing and removing Defendant Eagle, Defendant Wood had a fiduciary duty under ERISA to monitor Defendant Eagle's performance.

65.    By April 2020, the ESOP had proposed commercially reasonable terms for the purchase of the Estate's shares of 80/20 that satisfied both the requirements of Don Wood's will and the buy-sell agreement. But contrary to the ESOP's rights, the Estate did not sell or offer to sell the ESOP its 80/20 stock.

66.    While the Estate's personal representative was Lake City Bank (the "Bank"), the Bank and its counsel allowed the Foundation, as residual beneficiary of the Estate, to direct the Estate's actions with respect the ESOP—and informed Defendant Eagle of that fact. As chair of the Foundation, Defendant Wood thus inserted himself on both sides of the transaction, and Defendant Eagle was aware of Defendant Wood's role in the sale on behalf of the Estate.

67.    Defendant Wood was beset by conflicts. He was away from the company for more than a decade before reluctantly returning as chairman at the end of Don Wood's life (pursuant to the company's succession plan). He did not support the employee ownership culture that the company built in his absence and disagreed with his father's will that the ESOP should own the company. He therefore had personal reasons to reject the ESOP's offers—even if that meant violating the ESOP's rights under the will and buy-sell agreement and directing the company and Estate to violate their agreements and duties with respect to the ESOP.

68.    Under Defendant Wood's guidance and supervision, rather than comply with the buy-sell agreement by making an offer to the ESOP, or by accepting the ESOP's offer, the Estate sought other potential buyers for the Estate's shares of 80/20 and suspended negotiations with the ESOP.

15

69. Defendant Eagle failed to act to assert the ESOP's rights to purchase the Estate's shares. He failed to assert the ESOP's rights in court or otherwise, or take the necessary steps to obtain authority to do so. He instead acquiesced to Defendant Wood's desire to shop the company to other buyers, in breach of Defendant Eagle's fiduciary duties to the ESOP.

70. Defendant Wood was aware that Defendant Eagle had failed to protect the ESOP's interests and breached his fiduciary duties. Defendant Wood was thus required, as the appointing fiduciary, to intervene or take steps to protect the ESOP's right to buy additional 80/20 shares from the Estate. Because he was adverse to the ESOP in the specific transaction at issue, he failed to do so, allowing his personal conflicts to interfere with his judgment and conduct on behalf of the ESOP.

71. Although it had already proffered commercially reasonable terms entitling it to purchase the Estate's shares of 80/20 stock, in September 2020, the ESOP provided an updated offer in which it agreed to pay roughly $30 per share. This offer exceeded the requirements of both Don Wood's will and the buy-sell agreement, and so entitled the ESOP to purchase the Estate's shares of 80/20 stock.

72. The Estate nevertheless refused to sell the Estate's 80/20 stock to the ESOP and informed Defendant Eagle in September 2020 that it would terminate negotiations with the ESOP. The Estate then opted to accept an offer from the MPE Defendants that was substantially equivalent to the ESOP's offer, which also contemplated payment of around $30 per share. The Estate disingenuously informed Defendant Eagle that financing terms were a factor in selling to the MPE Defendants versus the ESOP.

73. In October 2020, the Estate entered into an exclusivity agreement with agents of the MPE Defendants, confirming its intention to terminate negotiations with the ESOP.

16

Accordingly, the Estate did not allow the ESOP to revise its offer to beat the MPE Defendants' bid or address supposed objectives of the Estate related to financing.

74.     Defendant Eagle failed to enforce the ESOP's rights after Defendant Wood (acting on behalf of the Foundation and Estate) terminated negotiations with the ESOP and signed an exclusivity agreement with the MPE Defendants. Defendant Wood's actions flagrantly violated the ESOP's rights, and Defendant Eagle had a duty to seek relief in court or to otherwise seek to enforce the ESOP's rights, which he failed to take any steps to do. He instead chose to abandon the ESOP's claims.

75.     Additionally, while the Estate's supposed financing objectives were pretextual and did not provide a valid legal basis to reject the ESOP's offer,[3] Defendant Eagle failed to exercise competence and diligence in putting together a bid on behalf of the ESOP that would meet the Estate's supposed objectives. There was a robust capital market for senior and subordinated debt of ESOP companies at the time, and Defendant Eagle could easily have raised additional outside financing to meet the supposed desire of the Estate and the Foundation for an offer with additional liquid capital, had he acted competently and diligently. Indeed, the MPE Defendants raised their financing package (which consisted of senior and subordinated debt that doubled the outside debt financing arranged by the ESOP under Defendant Eagle's direction) using the same asset to back repayment that the ESOP had at its disposal—the company and its debt-free balance sheet and revenue projections. Defendant Eagle made no effort to do so whatsoever. He instead imprudently chose to rely on the conflicted Officer Defendants to seek and obtain financing to support the ESOP's bid.

---

[3] The Foundation, as residual beneficiary of the Estate, did not need additional liquid capital beyond the amount provided in the ESOP's offer to meet its objectives. The Foundation's expenses and grant disbursements annually are less than the annual investment income the Foundation would have earned from market rate interest payments on the principal amount of the note offered as part of the ESOP's financing package and other investments.

76. For his part, Defendant Wood again failed to prudently monitor Defendant Eagle's performance and remedy Defendant Eagle's inaction. He did not intervene despite his knowledge that Defendant Eagle had breached his fiduciary duties and failed to protect the ESOP's rights. Instead, he attempted to remove Defendant Eagle as discretionary trustee, and he failed to appoint a new independent trustee with authority to enforce the ESOP's rights to buy additional shares from the Estate. While Defendant Wood was required to monitor the trustee and ensure that the ESOP was adequately protected, his role in directing violations of the ESOP's rights on behalf of the Estate prevented him from adequately discharging his duties to protect the ESOP.

*Closing the Deal and Terminating the ESOP and its Rights*

77. On or around March 2, 2021, company leadership gathered employees for an announcement. They introduced representatives from MPE and revealed that the company had been sold to the MPE Defendants.

78. Employees reacted to the announcement with silence and exchanged confused looks. They had expected to be told that *the ESOP* had completed its planned acquisition of the company. Instead, they heard the opposite—the ESOP would be terminated and would not own any part of the company going forward.

79. Unbeknownst to 80/20 personnel outside of the Officer Defendants, the Estate had entered into its exclusive letter of intent with an affiliate of the MPE Defendants on October 5, 2020. Two months later, Defendant Wood and the board purported to remove Defendant Eagle as the discretionary trustee of the ESOP with authority to enforce the ESOP's acquisition rights. At the same time, Defendant Wood and the board re-appointed Defendant Eagle as limited trustee with authority only to join the Estate in a sale of the company to the MPE Defendants.

18

Defendant Wood and the board further appointed the ESOP committee to direct Defendant Eagle with respect to the redemption of the ESOP's stock as part of the MPE deal.

80.    ERISA fiduciaries may not follow instructions that are contrary to ERISA. Accordingly, notwithstanding the limited nature of Defendant Eagle's re-appointment, his directions confirmed that he was required to "exercise his independent discretionary judgment . . . in accordance with . . . ERISA" and "determin[e] after due diligence whether . . . [he] can, under applicable law, consummate" the transaction.

81.    Defendant Wood orchestrated the approval process of the MPE deal in this manner in an effort to guarantee that the sale would go through and satisfy his personal objectives and preferences.

82.    Defendant Wood and the board appointed the ESOP committee to direct Defendant Eagle because Defendant Wood understood the Officer Defendants would vote to redeem the ESOP's shares as part of the MPE deal. Each of the Officer Defendants—who together comprised a committee majority—was conflicted, and Defendant Wood knew that this rendered the ESOP committee's supposed vote a foregone conclusion. Indeed, the Officer Defendants negotiated the MPE deal alongside Defendant Wood. As part of those negotiations, each of the Officer Defendants secured personal compensation from the Estate, the Foundation, and MPE contingent on the MPE deal closing.

83.    First, each of the Officer Defendants secured bonuses to be paid upon closing of the MPE deal. If the ESOP did not agree to sell its shares and release its acquisition claims, there would be no bonuses for the Officer Defendants.

84.    Second, the Officer Defendants were offered equity in the post-acquisition company by the MPE Defendants. If the ESOP did not agree to sell its shares and release its

19

acquisition claims, there would be no equity for the Officer Defendants. In other words, the Officer Defendants accepted the opportunity to deny the ESOP an attractive investment and to instead take part in that investment themselves, therefore effectively acting as both seller and buyer in the MPE deal.

85.     The MPE Defendants and Defendant Wood offered these inducements only to the Officer Defendants, and not to other employees. This was no coincidence.

86.     The Officer Defendants obliged Defendant Wood and the MPE Defendants and further acted to serve their own personal interests, in violation of their fiduciary duties under ERISA. In February 2021, just days before the MPE deal closing process was set to begin, the Officer Defendants directed Defendant Eagle to sell the ESOP's shares to the MPE Defendants alongside the Estate. The Officer Defendants further acknowledged the ESOP's acquisition rights under the buy-sell agreement and directed Defendant Eagle to agree to release the ESOP's rights and claims under the buy-sell agreement. The Officer Defendants' directions to Defendant Eagle also had the effect of terminating the ESOP's acquisition rights under Don Wood's will.

87.     The Officer Defendants took these actions without meaningful involvement from the two ESOP committee members who did not have personal incentives tied to the deal, including Plaintiff Walther. The Officer Defendants did not disclose their conflicts to Plaintiff Walther, and she was not aware of them until after the deal closed. They further did not explain that the ESOP committee had any discretion to reject the deal and presented the decision to sell the ESOP's shares and join the MPE deal as having already been made outside of the ESOP committee. Practically speaking, the decision *was* made outside the ESOP committee, as the Officer Defendants had already joined the buyer group while also comprising the ESOP committee majority, leaving nothing for the rest of the committee to decide.

20

88.     The financial benefits the Officer Defendants received in the deal represented value that the MPE Defendants were willing to part with in order to obtain the ESOP's shares and bring 100% of the company under their control. This value belonged to the ESOP, and equivalent consideration should have been received by the ESOP and not diverted to parties in interest. The Officer Defendants also used and disposed of ESOP assets—its 80/20 shares and its acquisition claims—in order to obtain these personal financial benefits.

89.     Notwithstanding the Officer Defendants' directions, Defendant Eagle retained the authority to reject the MPE deal on behalf of the ESOP. Because the MPE deal as a whole was contingent upon the redemption of the ESOP's shares of 80/20, this would have prevented the Estate from selling its shares to the MPE Defendants and preserved the ESOP's rights and ability to purchase that stock.

90.     Under the circumstances, Defendant Eagle was under a duty to reject the sale of the ESOP's stock and the release of the ESOP's acquisition rights. The MPE deal was tainted by wide-ranging fiduciary misconduct. Among other things, Defendant Eagle knew (1) the sale constituted a prohibited transaction due to the improper benefits it would confer on the Officer Defendants; (2) the sale was also a prohibited transaction because Defendant Wood, an ESOP fiduciary, had acted on behalf of the Estate, an adverse party, in the MPE deal; (3) approving the sale would definitively cut off the ESOP's rights to purchase the Estate's shares of 80/20 stock and harm the ESOP's interests; (4) the ESOP received no consideration in the sale for releasing its valuable rights to purchase the Estate's shares of 80/20 stock, which had value independent of the value of the shares the ESOP owned; and (5) the overall circumstances of the sale rendered it unfair and detrimental to the ESOP. To approve the disposition of the ESOP's stock under the terms presented constituted a clear violation of ERISA. Defendant Eagle approved it anyway.

91.     Defendant Wood appointed each of the Officer Defendants to their fiduciary positions in connection with the deal closing and thus assumed a fiduciary duty to monitor them. Defendant Wood was aware of the foregoing fiduciary breaches by those he appointed to serve the ESOP. But Wood did not intercede or seek to prevent or remedy these fiduciary breaches in any way. Indeed, he himself fostered and encouraged these breaches, and acted on behalf of the Estate to violate the ESOP's rights. Defendant Wood orchestrated the transaction to achieve his desired result at the expense of the ESOP, using his fiduciary appointment power and control of a counterparty to ensure the MPE deal would go through. Defendant Wood was also involved in negotiating the improper inducements offered to the Officer Defendants to secure their support. Defendant Wood thus not only failed to ensure that his appointed fiduciaries performed their fiduciary duties—he affirmatively ensured that they did not.

92.     Having received the necessary approvals, the MPE deal was primarily effectuated through two contracts dated February 24, 2021: (1) a Stock Redemption Agreement, signed by Defendant Eagle on behalf of the ESOP and by Defendant Buesching on behalf of the company, through which 80/20 redeemed the shares of stock held by the ESOP; and (2) an Equity Purchase Agreement, through which the MPE Defendants acquired the Estate's stake in the company.

93.     The Stock Redemption Agreement and Equity Purchase Agreement cross-referenced each other and were bound together into a single transaction.

94.     The Equity Purchase Agreement dictated the form of the Stock Redemption Agreement and explicitly incorporated the Stock Redemption Agreement by reference. Execution and delivery of the Stock Redemption Agreement confirming the redemption of the ESOP's shares was a condition of closing for the Equity Purchase Agreement, as was the termination of the ESOP following the redemption of its 80/20 stock. Closing under the Equity

22

Purchase Agreement was also contingent on ancillary documents and agreements, including Defendant Eagle's agreement to release the ESOP's acquisition rights and claims.

95.    The terms of both the Stock Redemption and Equity Purchase Agreements were negotiated together by the MPE Defendants, the Officer Defendants, Defendant Wood, and their advisors. Defendants uniformly referred to the redemption of the ESOP's stock as the first step of the closing process for the MPE deal, not a separate transaction.

*MPE's Liability*

96.    The MPE Defendants knew that the ESOP had the right to buy the Estate's shares. Indeed, the very same documents that established the Bank's authority to sell the shares to the MPE Defendants set forth the ESOP's rights to buy them.

97.    The MPE Defendants knowingly interfered with the ESOP's rights under Don Wood's will and the buy-sell agreement by offering the Officer Defendants bonuses and equity incentives to steer the deal toward them and forego the ESOP's acquisition rights. The MPE Defendants knew that their co-Defendants violated their fiduciary duties to the ESOP by failing to exercise or enforce the ESOP's rights and by causing the ESOP to sell its shares for the MPE Defendants' benefit.

98.    The MPE Defendants further understood that the MPE deal was as a prohibited transaction under ERISA. Among other things, they understood that (1) fiduciaries of the ESOP would receive improper benefits in connection with the transaction; (2) fiduciaries of the ESOP had stood on both sides of the negotiating table; and (3) the ESOP was not compensated for the loss of its valuable rights.

99.    The MPE Defendants received substantial benefits from the deal in the form of equity interests in the company and subsequent profits distributions, realized and unrealized gains, and other rights of ownership. The MPE Defendants knew that they received these

benefits due to their own efforts to interfere with the ESOP's rights and due to their co-Defendants' violations of ERISA.

*The Relationship Between the MPE Entities*

100.    Morgenthaler Private Equity Partners is a private equity firm that acquires businesses operating in the areas of manufacturing and commercial and industrial services.

101.    Businesses the firm acquires are owned by funds the firm controls, including MPE Partners II, L.P., and MPE Partners III, L.P.

102.    Partners and associates of the firm negotiated the purchase of 80/20, with the initial letter of intent formally issued by an entity they control called MPE MGT Co., LLC.

103.    The firm created Pareto Efficient Solutions, LLC, as a subsidiary of MPE Partners II, L.P. and MPE Partners III, L.P., a month before the sale of 80/20 closed.

104.    Pareto exists solely on paper. Its address, according to the Equity Purchase Agreement, is the Cleveland office of Morgenthaler Private Equity Partners, which is also the address of MPE Partners II, L.P., and MPE Partners III, L.P. The officer who signed that Agreement on Pareto's behalf is a partner of Morgenthaler Private Equity Partners. Every other officer of Pareto, including its President, Vice President, Secretary, and Treasurer is a partner of Morgenthaler Private Equity Partners. Every individual involved in negotiating the purchase of 80/20 on behalf of Pareto was a partner or associate at Morgenthaler Private Equity Partners, including several individuals who have no formal affiliation with Pareto. At all relevant times, Morgenthaler Private Equity Partners held itself out as controlling the purchasing entities.

105.    The website of Morgenthaler Private Equity Partners lists 80/20 as part of its "Current Portfolio" of companies, and states that the company is owned by its MPE Partners II, L.P. and MPE Partners, III, L.P. funds, with no mention of Pareto. Upon closing of the MPE

24

deal, Morgenthaler Private Equity Partners issued a press release (which again does not mention Pareto) stating that the firm had purchased 80/20.

106. Pareto does not have operations separate from its owners, MPE Partners II and MPE Partners III. All three entities are centrally controlled, do not operate at arm's length, do not observe corporate formalities, and have the same officers and directors.

107. Pareto was created solely for the purpose of deliberate misconduct—*i.e.*, to participate in, facilitate, and hold undue profits of the ERISA violations at issue in this case.

108. MPE Partners II and MPE Partners III hold the ill-gotten equity of 80/20 through their ultimate ownership and control of Pareto, which holds that equity directly.

### **PLAN-WIDE RELIEF**

109. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the ESOP pursuant to this statutory provision in addition to 29 U.S.C. § 1132(a)(3).

110. Plaintiffs seek recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches and seek equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

111. Plaintiffs are adequate to bring this derivative action on behalf of the ESOP, and their interests are aligned with other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the ESOP.

## CLASS ACTION ALLEGATIONS

112.    Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

113.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the ESOP defined as follows:

> All participants and beneficiaries of the ESOP after Don Wood Died, excluding any Defendant or employee of 80/20 who received an equity interest in the company or a bonus as a result of the MPE deal.

114.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had around 350 participants.

115.    <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were ESOP participants, and Plaintiffs suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

116.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

117.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

26

a. Whether Defendants Wood, Eagle, Buesching, Mauk, and Strack were fiduciaries with respect to the ESOP;

b. Whether Defendants Wood, Eagle, Buesching, Mauk, and Strack had a fiduciary duty to exercise or enforce the ESOP's rights to purchase the shares of 80/20 stock held by the Estate;

c. Whether the redemption of the ESOP's shares benefited parties in interest to the ESOP through equity interests in the post-ESOP company and bonuses;

d. Whether the ESOP received adequate consideration for its shares;

e. Whether the ESOP's fiduciaries failed to comply with the fiduciary standards of prudence and loyalty;

f. Whether the MPE Defendants knowingly participated in ERISA violations by the ESOP's fiduciaries;

g. The proper form of equitable and injunctive relief; and

h. The proper measure of monetary relief.

118. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members.

119. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not party to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as granting interests in specified property to the ESOP or ESOP participants, would be dispositive of the interests of all Class members.

120.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing individual actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single case.

121.     Plaintiffs and their undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## CAUSES OF ACTION

### Count I
**29 U.S.C. § 1106(b)**
**29 U.S.C. § 1105(a)**
*Against Defendants Wood, Eagle, Buesching, Mauk, and Strack*

122.     Plaintiffs incorporate the foregoing paragraphs by reference.

123.     Defendants Wood, Eagle, Buesching, Mauk, and Strack were fiduciaries of the ESOP at the time of the MPE deal.

124.     The Officer Defendants dealt with assets of the ESOP in their own interest, in violation of 29 U.S.C. § 1106(b)(1), by causing the ESOP to dispose of its assets as a contingent

component of a transaction in which they understood they would receive personal consideration including equity interests in Defendant Pareto and cash bonuses.

125.    The Officer Defendants further violated 29 U.S.C. § 1106(b)(2) by becoming personally adverse to the ESOP in the transaction. By negotiating equity interests in Defendant Pareto as part of the transaction, the Officer Defendants became both representatives of the seller and buyers on the other side of the transaction.

126.    The Officer Defendants also violated 29 U.S.C. § 1106(b)(3) by receiving consideration for their personal accounts from Defendant Pareto or the company in a transaction involving the ESOP by virtue of the personal benefits they received in the MPE deal.

127.    Defendant Wood violated 29 U.S.C. § 1106(b)(2) by acting on behalf of the Estate and Foundation in the sale of the Estate's 80/20 stock. The Estate and Foundation were adverse to the ESOP, with interests that diverged from and conflicted with those of the ESOP and its members. Moreover, the sale involved the ESOP as the first and preferred buyer pursuant to the buy-sell agreement and Don Wood's will. Defendant Wood acted on both sides, directing the Estate with respect to the ESOP's offers, appointing and removing the ESOP fiduciaries authorized to purchase the Estate's shares, extracting a release from the ESOP for the benefit of the Estate, conditioning the Estate's sale on the ESOP joining the sale as seller, and appointing the ESOP fiduciaries authorized to effect the release and the sale of the ESOP's shares. The ESOP would have successfully purchased the Estate's shares of 80/20 stock had Defendant Wood not illegally stood on both sides of the transaction in violation of 29 U.S.C § 1106(b)(2).

128.    Defendant Eagle is liable for the foregoing violations as a co-fiduciary of Defendant Wood and the Officer Defendants under 29 U.S.C. § 1105(a). Defendant Eagle was aware of the self-dealing and prohibited transactions described above. He did nothing to prevent

29

or redress those breaches. Instead, he ratified, assisted, and facilitated those breaches by approving the MPE deal and agreeing to release the ESOP's acquisition rights, despite his understanding that the deal constituted a prohibited transaction.

129.    Defendant Wood is liable as a co-fiduciary for the violations of the Officer Defendants described above under 29 U.S.C. § 1105(a). Defendant Wood was aware of the self-dealing and prohibited transactions by Defendants Buesching, Mauk, and Strack. Defendant Wood did nothing to prevent or redress those breaches. Instead, he ratified, assisted, and facilitated those breaches by appointing these Defendants to approve the MPE deal and definitively terminate the ESOP's acquisition rights, and by allowing them to maintain their roles in the transaction despite their personal interests that conflicted with the ESOP's.

130.    The Officer Defendants are liable as co-fiduciaries for the violations by Defendant Wood described above under 29 U.S.C. § 1105(a). Defendants Buesching, Mauk, and Strack were aware of Defendant Wood's self-dealing and prohibited transactions in acting on behalf of the Estate and Foundation but did nothing to prevent or redress those violations. Rather, they ratified, assisted, and facilitated those breaches by approving the MPE deal, despite their knowledge that it was tainted by Defendant Wood's prohibited transactions.

131.    The foregoing violations damaged the ESOP by (1) depriving it of its investment in the 80/20 stock held by the Estate; (2) disposing of the ESOP's rights to purchase the 80/20 stock held by the Estate and receiving no consideration for that release; and (3) diverting value that rightfully belonged to the ESOP in the MPE deal to its disloyal fiduciaries. The ESOP is entitled under 29 U.S.C. §§ 1109, 1132(a)(2), and 1132(a)(3) to recover the resulting losses and profits from these Defendants.

30

## Count II
### 29 U.S.C. § 1106(a)
### 29 U.S.C. § 1105(a)
*Against Defendants Wood, Eagle, Buesching, Mauk, and Strack*

132.    Plaintiffs incorporate the foregoing paragraphs by reference.

133.    The redemption of the ESOP's shares by the company violated 29 U.S.C. § 1106(a)(1)(A) & (D) because it was one component of a transaction that constituted the use of ESOP assets for the benefit of the Officer Defendants, and the indirect transfer of ESOP assets to the Officer Defendants, each of whom was a party in interest to the ESOP. Among other things, the redemption of the ESOP's stock was a component of the MPE deal in which the Officer Defendants received equity interests in Defendant Pareto and bonuses.

134.    Defendants Wood, Eagle, Buesching, Mauk, and Strack caused this prohibited transaction in their capacities as ESOP fiduciaries responsible for orchestrating and approving the redemption of the ESOP's stock. Each was aware of the improper benefits the MPE deal would confer on the ESOP's fiduciaries when they approved this contingent component of it.

135.    The transaction was not for adequate consideration. The equity and bonuses Defendants Buesching, Mauk, and Strack received in the transaction represent value diverted from the ESOP to its disloyal fiduciaries. The ESOP further received no compensation for agreeing to release its rights to purchase the 80/20 stock held by the Estate. Moreover, the process for evaluating the transaction was tainted by breaches of fiduciary duties detailed above.

136.    Defendants Wood, Eagle, Buesching, Mauk, and Strack caused losses to the ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for those losses, including by disgorgement of their unlawful personal gains in the transaction.

137.    Defendants Wood, Eagle, Buesching, Mauk, and Strack were each aware of the fiduciary breaches of the others and failed to act to protect the ESOP. Instead, each of these

31

Defendants ratified and facilitated the fiduciary breaches of the others by permitting the transaction to proceed. As such, each is liable as a co-fiduciary for the breaches of their fellow fiduciaries.

**Count III**
**29 U.S.C. § 1104(a)(1)**
**29 U.S.C. § 1105(a)**
*Against Defendants Wood, Eagle, Buesching, Mauk, and Strack*

138.    Plaintiffs incorporate the foregoing paragraphs by reference.

139.    Defendant Wood, as board chair, was an appointing fiduciary under ERISA, with authority to appoint, monitor, and remove other ESOP fiduciaries.

140.    Defendant Eagle, as the ESOP's trustee, was a fiduciary under ERISA, with the powers allocated to him by plan documents and engagement agreements, and a duty to satisfy ERISA standards notwithstanding any contrary directions.

141.    The Officer Defendants were fiduciaries under ERISA tasked with exercising authority granted by Defendant Wood and the board to the ESOP committee.

142.    Defendants Wood, Eagle, and the Officer Defendants failed to act prudently or solely in the interest of ESOP participants in connection with their respective fiduciary duties to the ESOP.

143.    Among other things, Defendant Eagle (1) failed to take any action to enforce the ESOP's rights to purchase the 80/20 stock held by the Estate and imprudently agreed to release the ESOP's acquisition rights; (2) failed to diligently pursue alternative funding for the ESOP's purchase of 80/20 stock held by the Estate; (3) authorized the sale of ESOP's assets as part of an unfair transaction he understood to have been tainted by self-dealing by Defendant Wood and the Officer Defendants; (4) failed to bargain for any consideration (let alone adequate consideration) in exchange for the ESOP releasing its rights to purchase the Estate's shares of 80/20 stock; and

32

(5) failed to utilize the ESOP's ability to prevent the MPE deal outright to either preserve the ESOP's right to purchase the estate's shares of 80/20 stock or obtain better terms for the ESOP.

144. Among other things, the Officer Defendants (1) participated in approving the MPE deal despite personal interests in that transaction that were adverse to the ESOP and which prevented them from acting prudently and loyally; (2) authorized the sale of ESOP's assets as part of a transaction that they knew would confer improper benefits on fiduciaries of the ESOP; (3) failed to take any steps to enforce the ESOP's rights to purchase the Estate's shares of 80/20 stock; (4) directed Defendant Eagle to release the ESOP's acquisition rights to the ESOP's detriment, and for no consideration; and (5) authorized the MPE deal with the knowledge that the circumstances rendered the deal fundamentally unfair to the ESOP and its participants.

145. Defendant Wood appointed Defendant Eagle and the Officer Defendants to their fiduciary positions and had a duty to monitor their performance of their duties. Defendant Wood was aware of the foregoing breaches of fiduciary duty by those he appointed, but took no action to remedy those fiduciary breaches or to remove or replace his appointed fiduciaries. Rather, he ratified and incentivized those ERISA violations based on his personal interests and not the interest of ESOP participants.

146. Had Defendants Wood, Eagle, Buesching, Mauk, and Strack performed their fiduciary duties in the prudent and loyal manner required by ERISA, the ESOP would have successfully acquired additional shares from the Estate or received additional value from the sale of the ESOP's shares and the release of its rights and claims.

147. Defendants Wood, Eagle, Buesching, Mauk, and Strack caused losses to the ESOP resulting from the above-mentioned fiduciary breaches and are liable to the ESOP for

33

those losses. They are further liable for their unlawful gains they received in connection with their fiduciary misconduct.

148.    Defendants Wood, Eagle, Buesching, Mauk, and Strack were each aware of the fiduciary breaches of the others and failed to act to protect the ESOP. Instead, each of these Defendants ratified and facilitated the fiduciary breaches of the others. As such, each is liable as a co-fiduciary for the breaches of their fellow fiduciaries.

**Count IV**
**29 U.S.C. § 1132(a)(3)**
*Against the MPE Defendants*

149.    Plaintiffs incorporate the foregoing paragraphs by reference.

150.    Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" Such "appropriate equitable relief" includes recovering proceeds of a fiduciary violation from a knowing participant in the violation. *See Harris Trust v. Solomon Smith Barney*, 530 U.S. 238 (2000).

151.    The MPE Defendants knew that that the transaction in which they purchased 80/20 was a prohibited transaction under ERISA because (1) it constituted a use of the ESOP's assets for the benefit of fiduciaries and parties in interest; and (2) fiduciaries of the ESOP acted on behalf adverse parties (the Estate, the Foundation, and themselves) in the transaction.

152.    The MPE Defendants further knew that the transaction in which they purchased 80/20 resulted from breaches of fiduciary duty by Defendants Wood, Eagle, Buesching, Mauk, and Strack. The MPE Defendants knowingly and intentionally undermined those Defendants' fiduciary duties by offering improper benefits to ensure support for the MPE Defendants' acquisition of the company from the estate and ESOP, in derogation of the ESOP's right to purchase 80/20. The MPE Defendants knew that the resulting deal violated Defendants Wood,

34

Eagle, Buesching, Mauk, and Strack's respective fiduciary duties to act prudently and in the interest of the ESOP.

153.    The MPE Defendant now hold and enjoy the benefits of those violations of ERISA, in the form of their interest in 80/20's equity.

154.    Pursuant to principles of equity, as adopted and applied by federal courts in ERISA cases, the MPE Defendants must be denied any benefit from its knowing participation in Defendants Wood and Eagle's fiduciary violations against the ESOP.

## **PRAYER FOR RELIEF**

155.    Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    Certify Plaintiffs' authority to seek plan-wide relief on behalf of the ESOP pursuant to 29 U.S.C. § 1132(a)(2);

B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as Class representatives, and certify their counsel as Class counsel;

C.    Order Defendants Wood, Eagle, Buesching, Mauk, and Strack to make good to the ESOP all losses resulting from their violations of ERISA, and disgorge any gains;

D.    Impose an equitable lien or constructive trust for the benefit of the ESOP and the Class on income distributions and capital gains received by or owed to the MPE Defendants based on their equity interest in the company, and order an accounting of such distributions and gains, or alternatively, order recission of the contracts by which the MPE Defendants acquired their interest in 80/20;

E.    Appoint an independent trustee to manage the collection of recovered sums, enforcement of equitable interests granted to the Class, and the allocation and distribution of recovered benefits;

F.    Approve a fair and equitable plan of allocation of any recovered benefits to the Class;

G.    Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common

fund method;

H.    Award prejudgment and post-judgment interest; and

I.    Award such other and further relief as the Court deems just and equitable.

Dated: November 22, 2023                    Respectfully submitted,

**ENGSTROM LEE LLC**
/s/ Charlie C. Gokey
Charlie C. Gokey, MN. Bar No. 0402225*
Jennifer K. Lee, MN Bar No. 0399012*
Carl F. Engstrom, MN Bar No. 0396298^
729 N. Washington Ave., Suite 600
Minneapolis, MN 55401
Telephone: (612) 305-8349
jlee@engstromlee.com
cengstrom@engstromlee.com
cgokey@engstromlee.com

*Admitted to the bar of the U.S. District Court
for the Northern District of Indiana
^Admitted *Pro Hac Vice*

*ATTORNEYS FOR PLAINTIFFS*