## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| Martha Walther, Trent Kumfer, Jayme Lea, Megan Kelsey, Dave Lowe, Carol Whisler, and Michele Porter, as representatives of a class of similarly situated persons, and on behalf of the 80/20, Inc. Employee Stock Ownership Plan, | Case No. 1:23-cv-00294-HAB-SLC |
|     Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| v. | **CLASS ACTION** |
| John Wood, Brian Eagle, Patrick Buesching, Patrice Mauk, Rodney Strack, MPE Partners II, L.P., MPE Partners III, L.P., and Pareto Efficient Solutions, LLC, | |
|     Defendants. | |

Plaintiffs Martha Walther, Trent Kumfer, Jayme Lea, Megan Kelsey, Dave Lowe, Carol Whisler, and Michele Porter, as representatives of the Class described herein, and on behalf of the 80/20, Inc. Employee Stock Ownership Plan (the "ESOP"), bring this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, against Defendants John Wood, Brian Eagle, Patrick Buesching, Patrice Mauk, Rodney Strack, MPE Partners II, L.P., MPE Partners III, L.P., and Pareto Efficient Solutions, LLC, and further state as follows.

## <u>INTRODUCTION</u>

1.     This case concerns an ESOP that had the opportunity and legal right to make a lucrative investment. But the ESOP lost that investment due to the misconduct and self-dealing of the fiduciaries charged with protecting the ESOP's interests. As a result of those breaches of fiduciary duty, the ESOP's investment was diverted to a private equity firm, the ESOP sold its assets on patently unfair terms, and the ESOP and its members lost tens of millions of dollars.

2.     Don Wood founded 80/20, Inc. ("80/20" or the "company") in Fort Wayne, Indiana in 1986. Defendant John Wood, his son, worked for the company in the early years and is sometimes credited as a co-founder.

3.     The company manufactures patented building components known as The Industrial Erector Set. From modest beginnings, by 2016, the company grew to be an economic powerhouse in Northeast Indiana. The company employs around 400 workers at its 300,000 square foot campus in Columbia City, Indiana.

4.     Don Wood's dream was that 80/20's employees would own the company. In 2016, he created the ESOP to make that dream a reality. He sold 10% of the company to the ESOP *inter vivos* and gave the ESOP the right to purchase the remainder of the company from his estate upon his death, both in a codicil to his will and in a buy-sell agreement with 80/20.

5.     In 2019, Don Wood died. At that time, he owned all 80/20 stock not already owned by the ESOP, and his shares passed to his estate. He never modified or revoked the ESOP's rights to buy his shares after his death.

6.     After stepping away from 80/20 for more than a decade, Defendant Wood returned as chairman of the board shortly before his father's death. In that position, Defendant Wood acted as a fiduciary of the ESOP responsible for appointing and monitoring the ESOP's independent trustee, Defendant Eagle, an Indianapolis attorney, as well as the 80/20 ESOP committee, including Defendants Buesching, Mauk, and Strack, who were 80/20's highest-ranking executives and comprised a controlling ESOP committee majority.

7.     Defendant Wood also assumed control of the Don Wood Foundation (the "Foundation") following his father's death. Defendant Buesching worked alongside Defendant Wood as a trustee of the Foundation. The Foundation was the residual beneficiary of Don

Wood's estate (the "Estate") and stood to receive the proceeds of the sale of its 80/20 shares to the ESOP. The Foundation, with Defendants Wood and Buesching at the helm, directed the Estate in matters related to the disposition of the 80/20 stock held by the Estate.

8.      After Don Wood died, Defendant Eagle began working with the Estate to finalize a deal for the ESOP to acquire the Estate's stock. The ESOP was ideally positioned to purchase Don Wood's 90% stake in 80/20 and had a legal right to do so. But the deal never occurred due to wide-ranging fiduciary misconduct by Defendants Wood, Eagle, Buesching, Mauk, and Strack. Instead, the company, including the ESOP's 10% stake, was sold to Defendants MPE Partners II, L.P., MPE Partners III, L.P., through Pareto Efficient Solutions, LLC (collectively, the "MPE Defendants"). The ESOP and its participants lost their valuable investment, received unfair terms in the sale of the company to the MPE Defendants, and suffered tens of millions of dollars in damages that continue to accrue to this day.

9.      Each Defendant played an integral role in causing the ESOP's losses.

10.     Defendant Eagle, as the ESOP's trustee who was appointed to negotiate the ESOP's purchase of 80/20, had a fiduciary duty to make diligent efforts to consummate the transaction between the Estate and the ESOP and to enforce the ESOP's right to purchase 80/20. But he failed to negotiate that deal with ordinary diligence and prudence. He further failed to take steps to enforce the ESOP's right to purchase 80/20 after this caused the negotiations to fall apart. And when ordered to give up the ESOP's right to purchase 80/20 and to instead sell the ESOP's stock as part of a sale that was detrimental to the ESOP's interests, Defendant Eagle acquiesced, failing to negotiate consideration for release of the ESOP's valuable acquisition rights and claims. The foregoing breached Defendant Eagle's fiduciary duties under ERISA.

11.     Defendant Wood, as a member of 80/20's board with the power to appoint the ESOP's fiduciaries, was himself a fiduciary of the ESOP, with a duty to monitor those he appointed. But Defendant Wood not only failed to ensure that Defendant Eagle competently negotiated the ESOP's purchase of 80/20, he assumed an adverse position to the ESOP in the transaction on behalf of the Foundation. He caused the Foundation (1) to refuse to honor the ESOP's right to buy the company; (2) to instead undertake a sale and bidding process that stacked the deck against the ESOP; and (3) to use the ESOP's assets as a bargaining chip in negotiating a sale of 80/20 to the MPE Defendants for the benefit of the Foundation. Defendant Wood further used his power over the ESOP to appoint conflicted individuals to approve this sale on the ESOP's behalf and to terminate the ESOP's right to purchase 80/20. At every step, Defendant Wood used his fiduciary powers to subordinate the interests of the ESOP to those of the Foundation. The foregoing violated Defendant Wood's fiduciary duties under ERISA.

12.     Defendant Buesching, as a member of the ESOP committee, and later as a member of 80/20's board of directors, was likewise a fiduciary of the ESOP. He too took an adverse position to the ESOP in the sale of 80/20 in multiple respects. First, he stood opposite the ESOP, and alongside Defendant Wood, in his role as a trustee of the Foundation, and had a hand in the Foundation's actions that injured the ESOP. Second, Defendant Buesching, in his capacity as 80/20's CEO, negotiated against the ESOP's interests on behalf of 80/20 in the sale of the company to the MPE Defendants. Third, Defendant Buesching negotiated against the ESOP's interests on his own behalf, securing consideration for himself in the sale of 80/20 to the MPE Defendants that should have gone to the ESOP. He then used his power as a member of both the ESOP committee and 80/20's board of directors to cause the ESOP to give up its right to

buy 80/20 and to instead sell its stock and release its claims as part of the sale of 80/20 to the MPE Defendants. The foregoing violated Defendant Buesching's fiduciary duties under ERISA.

13.     Defendants Mauk and Strack, as members of the ESOP Committee, were also fiduciaries of the ESOP. Like Defendant Buesching, Defendants Mauk and Strack nonetheless negotiated against the ESOP's interests in their capacities as officers of 80/20 in the sale of the company to the MPE Defendants. Also like Defendant Buesching, Defendants Mauk and Strack negotiated against the ESOP on their own behalf in that transaction, securing consideration for themselves in the sale of 80/20 to the MPE Defendants that should have gone to the ESOP. And together with Defendant Buesching, Defendants Mauk and Strack constituted the conflicted controlling block of the ESOP committee that caused the ESOP to give up its right to purchase 80/20 and to instead sell its stock as part of the sale of the company to the MPE Defendants. The foregoing violated Defendant Mauk and Strack's fiduciary duties under ERISA.

14.     The MPE Defendants knew that they obtained 80/20 as a result of the foregoing prohibited transactions and fiduciary breaches. Indeed, the MPE Defendants deliberately fostered and caused the other Defendants' unlawful actions.

15.     Because Defendants did not protect the ESOP's rights, Plaintiffs must do so. Defendants Wood, Eagle, Buesching, Mauk, and Strack are liable to the ESOP and the Class for damages for lost investment opportunity, losses on the disposition of ESOP assets, and ill-gotten gains. Additionally, the ESOP and Class are entitled to an equitable lien or constructive trust on income distributions and capital gains received by or owed to the MPE Defendants and Defendants Buesching, Mauk, and Strack.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

17.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

18.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the ESOP was administered in this district and the fiduciary breaches occurred in this district.

## PARTIES

*Plaintiffs*

19.     Plaintiff Martha Walther is a natural person residing in Claypool, Indiana. She worked for 80/20 between 2013 and June 2021 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been, and would continue to be, worth more had Defendants not violated ERISA as set forth herein. She was an ESOP committee member at the time the MPE deal closed. Unlike Defendants Buesching, Mauk, and Strack (the ESOP committee majority), she was not given personal incentives in connection with the MPE deal. She was not aware of the personal incentives received by the committee majority until after the deal closed, nor was she aware that the ESOP committee was given any discretion to reject the deal.

20.     Plaintiff Trent Kumfer is a natural person residing in Columbia City, Indiana. He worked for 80/20 between 2011 and July 2021 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. His account would have been, and would continue to be, worth more had Defendants not violated ERISA as set forth herein.

21.    Plaintiff Jayme Lea is a natural person residing in Columbia City, Indiana. She worked for 80/20 between 2015 and March 2020 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been, and would continue to be, worth more had Defendants not violated ERISA as set forth herein.

22.    Plaintiff Megan Kelsey is a natural person residing in Fort Wayne, Indiana. She is an 80/20 employee who began working for the company in July 2016. She had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been, and would continue to be, worth more had Defendants not violated ERISA as set forth herein.

23.    Plaintiff Dave Lowe is a natural person residing in Columbia City, Indiana. He was an 80/20 employee from August 2014 to June 2023 and had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. His account would have been worth more at the time he retired in June 2023, and had he requested a cash distribution at that time, would have received more than he did when the ESOP terminated in 2021, had Defendants not violated ERISA as set forth herein.

24.    Plaintiff Carol Whisler is a natural person residing in Columbia City, Indiana. She was an 80/20 employee from June 2017 to November 2023. She had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her account would have been, and would continue to be, worth more had Defendants not violated ERISA as set forth herein.

25.    Plaintiff Michele Porter is a natural person residing in Columbia City, Indiana. She is an 80/20 employee who began working for the company in 2011. She had an ESOP account until the ESOP closed and distributed all its assets as result of the MPE deal. Her

account would have been, and would continue to be, worth more had Defendants not violated ERISA as set forth herein.

*The ESOP*

26.     Plaintiffs sue derivatively on behalf of the ESOP pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3).[1]

27.     The ESOP was established effective January 1, 2016, by 80/20. It was administered at 80/20's headquarters in Columbia City, Indiana. It was governed by written terms (the "plan document").

28.     The ESOP was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); an "individual account plan" as defined by 29 U.S.C. § 1002(34) (also known as "defined contribution plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6).

29.     The ESOP's participants were 80/20 employees who met minimum age and service requirements prior to the ESOP's termination as a result of the MPE deal. 80/20 was thus the ESOP "employer" within the meaning of 29 U.S.C. § 1002(5). As the ESOP employer, 80/20 was a party in interest within the meaning of 29 U.S.C. § 1002(14)(C).

30.     The purpose of the ESOP was to allow 80/20 employees to beneficially own company stock and receive retirement benefits based on the company's value. On January 1, 2017, the ESOP acquired 10% of 80/20 stock.

31.     The ESOP was controlled by the company's directors, who had authority to appoint an independent trustee and ESOP committee and direct them as to the scope and use of their powers.

---

[1] To the extent that any relief sought in this action is not available under 29 U.S.C. § 1109(a) and 1132(a)(2), Plaintiffs alternatively and additionally seek relief pursuant to 29 U.S.C. § 1132(a)(3).

32.     Participants were allocated shares to their individual accounts in the ESOP by the trustee based on procedures defined in the ESOP's governing documents. Upon a qualifying event such as retirement, participants could tender their shares to the company for redemption and distribution of the proceeds. Outside of a qualifying event, ESOP participants could not individually elect to buy or sell shares. Instead, they relied on the ESOP's fiduciaries to exercise the ESOP's rights to buy and sell stock on behalf of 80/20 employees as beneficial owners.

33.     As a requirement of the MPE deal, the ESOP was terminated, and all ESOP shares were redeemed by the company. All account balances were distributed to participants during 2021 and 2022.

*Defendants*

34.     Defendant John Wood is a natural person residing in Hickory Corners, Michigan. He was chairman of 80/20's board from fall 2018 through the closing of the MPE deal in March 2021. Under the plan document, only the board could appoint or remove the ESOP trustee and ESOP committee. Defendant Wood therefore acted as a "fiduciary" of the ESOP under 29 U.S.C. §§ 1002(21)(A)(i) & (iii) at all times relevant to this action.[2] Defendant Wood was also a party in interest to the ESOP under 29 U.S.C. § 1002(14)(H). Defendant Wood additionally served as the chairman of the board of the Foundation between 2019 and 2021.

35.     Defendant Brian Eagle is a natural person residing in Fishers, Indiana. Pursuant to appointments authorized by 80/20's board, Defendant Eagle served as the ESOP's independent trustee from the inception of the ESOP in 2016 through the closing of the MPE deal in March 2021. Between the ESOP's inception and December 2, 2020, Defendant Eagle had discretionary

---

[2] The MPE deal documents confirm that the parties viewed the "responsibilities [under ERISA] of the Board of Directors of the Company as 'appointing fiduciaries'" to be separate and distinct from the fiduciary responsibilities allocated to the ESOP trustee. *See* ECF No. 40-1, Stock Redemption Agreement ¶ 4(f)(2).

authority to acquire company shares from the company or any shareholder on behalf of the ESOP and to finance any such acquisition. Effective December 2, 2020, the board removed Defendant Eagle as the ESOP fiduciary authorized to buy shares on behalf of the ESOP and re-appointed him with powers limited to selling the ESOP's shares to the MPE Defendants. In his limited appointment, Defendant Eagle was required to "exercise his independent discretionary judgment in connection with the . . . disposition of Trust assets in accordance with . . . ERISA" and "determin[e] after due diligence whether . . . [he] can, under applicable law, consummate" the MPE deal. At all times, Defendant Eagle acted as a "fiduciary" of the ESOP for purposes of 29 U.S.C. §§ 1002(21)(A)(i) & (iii).

36.    Defendant Patrick Buesching was the CEO of 80/20 between Don Wood's death and August 2021, was the chair of the 80/20 ESOP committee at all relevant times between 2019 and 2021, and served as a member of the company's board of directors beginning no later than February 2021. Defendant Buesching was also a Foundation trustee and board member during relevant times between 2019 and 2021. And since early 2021, Defendant Buesching has also been a member of the MPE Defendants through his membership interests in Pareto. At all relevant times, he acted as a "fiduciary" of the ESOP under 29 U.S.C. §§ 1002(21)(A)(i) & (iii). He was also a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14) as a fiduciary of the ESOP and an officer of 80/20.

37.    Defendant Patrice Mauk has been the CFO of 80/20 since before Don Wood's death and continues to serve in that role. She was a member of the ESOP committee at all relevant times between 2019 and 2021. Defendant Mauk has also been a member of the MPE Defendants through her membership interests in Defendant Pareto since early 2021. At all relevant times, she acted as a "fiduciary" of the ESOP under 29 U.S.C. §§ 1002(21)(A)(i) & (iii).

She was also a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14) as a fiduciary of the ESOP and an officer of 80/20.

38.     Defendant Rodney Strack has been the Executive Director of Sales of 80/20 since before Don Wood's death and continues to serve in that role. He was a member of the ESOP committee at all relevant times between 2019 and 2021. Defendant Strack has also been a member of the MPE Defendants through his membership interests in Defendant Pareto since early 2021. At all relevant times, he acted as a "fiduciary" of the ESOP under 29 U.S.C. §§ 1002(21)(A)(i) & (iii). He was also a "party in interest" to the ESOP pursuant to 29 U.S.C. § 1002(14) as a fiduciary of the ESOP and an officer and employee of 80/20.

39.     Defendants MPE Partners II, L.P and MPE Partners III, L.P. ("MPE Partners II and III") are limited partnerships organized under the laws of the state of Delaware that make equity investments in privately held companies. In March 2021, through the MPE deal, MPE Partners II and III acquired a controlling equity position in 80/20 through Defendant Pareto Efficient Solutions, LLC ("Pareto"), a Delaware limited liability company created by MPE Partners II and III in January 2021 for the sole purpose of acquiring and holding 80/20's equity for the benefit of MPE Partners II and III and their investors (including the Officer Defendants). MPE Partners II and III and Pareto are under common control by individuals associated with Morgenthaler Private Equity Partners.

### FACTUAL BACKGROUND

*Don Wood Founds 80/20*

40.     Don Wood was an entrepreneur, toolmaker, and salesman.

41.     In 1986, Don Wood incorporated 80/20 in Fort Wayne, Indiana.

42.     Don Wood's vision for 80/20 was to create a company that could provide adjustable, modular machine building solutions to the automation industry. The result was a

catalog of unique framing structures and fasteners designed and manufactured by the company, the core components of which are protected by patents owned by the company.

43.    Don Wood also developed sales and service teams to help customers imagine and implement customized uses for 80/20's products. The company developed its trademark, The Industrial Erector Set, in its first few years. The company used its distinctive brand and focus on sales and service to inspire new applications for 80/20 products in a range of industries.

44.    The company was successful. By 2016, the company had grown to around 400 employees and occupied more than 300,000 square feet of manufacturing and office space in Columbia City, Indiana.

45.    Don Wood's three sons, including Defendant Wood, helped him to develop 80/20 in the early years and are sometimes credited as co-founders. His sons left the company at different times. As of July 2016, Don Wood was the President, sole Director, and sole voting shareholder of 80/20.

*Don Wood Creates the ESOP*

46.    In the years leading up to his death, Don Wood resolved to sell 80/20 to his employees via an ESOP. Don Wood's avowed intent, as told to those charged with administering his Estate, was that his employees would ultimately own 100% of the company through the ESOP. He was motivated in part by his appreciation for the work of 80/20's employees, and in part by his strong belief in the benefits of locally owned businesses.

47.    Don Wood created the ESOP in 2016, with an effective date of January 1, 2016. He further appointed Defendant Eagle as independent trustee. And as of January 1, 2017, Don Wood sold 10% of his stake in the company to the ESOP, which Defendant Eagle agreed to purchase on behalf of the ESOP as trustee.

48.    In order to finance the transaction, the company took out a loan, and the ESOP used the proceeds of the loan to buy 10% of 80/20's stock. In exchange for use of the loan proceeds, the ESOP agreed to repay the company in installments, which would be funded by stock dividends and tax-deductible contributions from the company to the ESOP. This is a common method used to finance equity transfers to ESOPs.

49.    At the same time Don Wood created the ESOP and sold it 10% of his stake in 80/20, he also took steps to convey the remainder of his interest in the company to the ESOP following his death.

50.    On July 29, 2016, Don Wood republished his will, adding a new clause related to the disposition of his interest in 80/20 upon his death:

> I appoint LAKE CITY BANK, or its successor in interest, as my personal representative. If my estate owns an interest in 80/20, Inc., it is my intent that said interest be sold and I direct the personal representative of my estate to take all actions necessary to sell said interest in a commercially reasonable manner. **In any such sale my preference would be to sell 80/20, Inc. to an employee stock ownership plan for the benefit of the employees of 80/20, Inc.**, and alternatively to a third-party purchaser.

(emphasis added).

51.    The language of Don Wood's will—granting a "preference" to the 80/20 employee stock ownership plan in the sale of his shares—conferred upon the ESOP an enforceable right to purchase his stock from the Estate.

52.    Those involved in administering the Estate understood this codicil to impel the Estate to sell Don Wood's 80/20 stock to the ESOP following his death so long the sale could be accomplished in a commercially reasonable manner. They further understood Don Wood did not intend for the company to be marketed to third parties before it was offered to the ESOP.

53.     On or around January 1, 2017, Don Wood also entered into a buy-sell agreement with 80/20 providing a framework for the sale of the Estate's interest in 80/20 after his death. The buy-sell agreement required the Estate to "offer . . . to sell all or any portion of the Shares owned by Donald F. Wood at his death to" the ESOP "at the ESOP Purchase Price" as defined in the agreement "upon the terms to be determined between Wood and the [ESOP]."

54.     After making the offer to the ESOP, the buy-sell agreement also permitted the Estate to sell the portion of the company the ESOP declined to buy to a third party. Those charged with administering the Estate understood it was Don Wood's intent that a controlling interest in the company was not to be sold to a third party, and that the ESOP should acquire at the least a controlling interest. They further understood Don Wood included the option to sell to a third party in the buy-sell agreement only as recourse if the ESOP could not purchase the entire company from his Estate in a commercially reasonable manner.

55.     Publicly, Don Wood made it known that he expected 80/20 to be and to remain a company owned by its employees. For example, he explained his decision to create the ESOP as follows in a press release hosted on the website of Defendant Eagle's law firm:

> The decision to shift ownership to the employees has been a dream of mine. It's a great feeling to see it come to fruition . . . . As stakeholders of the company, now all our employees can experience the responsibility and pride of being an owner.

56.     Don Wood personally let it be known widely among 80/20's employees that, consistent with his will and the buy-sell agreement, he intended for the ESOP to ultimately purchase more of the company, and if possible, all of it. He explained to Defendants Buesching, Mauk, and Strack, 80/20's highest-ranking executives, that the goal was to eventually sell 100% of the company to the ESOP, and he directed the them to manage the company in a manner that would ultimately facilitate that sale.

14

57.     The ESOP was cause for celebration at 80/20. Don Wood commissioned an "ESOP Communication Committee" with the mandate to rally employees around the virtues of employee ownership and prepare them to become full owners of the company.

58.     The company's message to employees was a mix of gratitude, duty, and motivation. The company characterized the ESOP as a reward for making the company so valuable. The company admonished employees that being an owner brought special responsibilities to the company and each other. The company instructed employees to take care of the company as their own property and work with a "servant heart" to benefit the collective. And at Don Wood's direction, the company repeatedly and consistently told employees that the ESOP would one day own 100% of the company—motivation to bring the company to new heights and invest their careers in 80/20.

59.     The company's messaging campaign around the ESOP was successful. Employees took pride in the ESOP and bought into the company's message that the ESOP would expand its position over time.

*Don Wood's Death*

60.     Don Wood died in March 2019.

61.     At the time of his death, Don Wood owned all 80/20 shares not owned by the ESOP.

62.     A week later, the company hosted a celebration of life ceremony at company headquarters attended by many employees.

63.     At the celebration of life ceremony, Don Wood's son, Dave Wood, acknowledged the rights of the ESOP under Don Wood's will and the buy-sell agreement, announcing that the company would be sold to the ESOP. His statements were then printed and distributed to all employees in the company newsletter.

*The Sale of the Estate's Shares*

64.     Consistent with Don Wood's will and the buy-sell agreement, which both independently granted the ESOP a right to buy Don Wood's 90% stake in 80/20 following his death, the Estate and the ESOP began preparing the sale of the Estate's shares to the ESOP.

65.     The proceeds from the sale would go to the Foundation, which was the residual beneficiary of the Estate. While the Estate's personal representative was Lake City Bank, the bank and its counsel allowed the Foundation to direct the Estate's actions with respect the sale of the Estate's 80/20 stock, including in negotiations with the ESOP.

66.     Defendants Wood and Buesching were fiduciaries of the ESOP bound to act in the ESOP's best interests. But they were also respectively chair and treasurer of the Foundation, the true counterparty to the ESOP in the sale of the Estate's stock, and took an active role in negotiating the sale on behalf of the Foundation and against the ESOP. Defendants Wood and Buesching thus inserted themselves on both sides of the transaction. This presented a glaring conflict. Defendant Eagle was aware of this conflict, but took no steps to remedy it.

67.     The Estate and Foundation acknowledged the ESOP's right to purchase the Estate's shares of 80/20 stock and initially proceeded on the understanding that they would offer to sell the ESOP all of the 80/20 stock held by Don Wood at his death without shopping the company to prospective third-party buyers.

68.     As part of the sale process, the ESOP agreed to be and did become bound by the terms of the buy-sell agreement along with the parties. The ESOP was understood by the Estate, the Foundation, and the company to have the right to enforce the buy-sell agreement.

69.     80/20 stock was a prudent—indeed, highly attractive—investment. The company's sales and profitability were trending upward in 2019, and the company had virtually no debt. Moreover, 80/20 workers showed a strong interest in expanding the ESOP's stake in the

16

company. Employees attended ESOP-related events, asked frequent questions regarding the ESOP, and were committed to the culture of employee ownership that the company fostered at Don Wood's direction. It was in the best interests of the ESOP and its members for the ESOP to purchase the 80/20 stock held by Don Wood's estate.

70.     As the discretionary trustee of the ESOP for purposes of buying additional 80/20 shares from the Estate, Defendant Eagle had a fiduciary duty under ERISA to prudently and diligently pursue a deal on behalf of the ESOP and to assert the ESOP's right to purchase 80/20.

71.     As a board member responsible for appointing and removing Defendant Eagle, Defendant Wood had a fiduciary duty under ERISA to monitor Defendant Eagle's performance. And as co-fiduciaries to Defendant Eagle, Defendants Buesching, Mauk, and Strack each had a duty to seek to prevent or remedy any breach of Defendant Eagle's fiduciary duties of which they were aware.

72.     Defendant Eagle failed to negotiate the deal with ordinary diligence and prudence. Defendants Wood, Buesching, Mauk, and Strack failed to take any corrective measures despite their knowledge of Defendant Eagle's breach of his fiduciary duties.

73.     Among other things, Defendant Eagle delayed pursuing the sale of 80/20 to the ESOP for months in a manner that was neither diligent nor prudent. Don Wood died on March 28, 2019. Defendant Eagle waited eight months after that date to retain a valuation advisor—a necessary first step in the sale process that Defendant Eagle finally took more than a month after the initial deadline set in the buy-sell agreement for the ESOP to purchase the Estate's shares of 80/20 stock. Defendant Eagle only undertook this first step around the time he learned that, after this long delay, the Estate and Foundation had begun to consider shopping the Estate's shares of 80/20 to third parties.

74.     Defendant Eagle similarly failed to diligently and prudently pursue financing for the sale of the Estate's shares to the ESOP. On December 31, 2019, months after the deadline by which the ESOP was originally slated to have accepted or rejected the Estate's offer of 80/20 stock, the Officer Defendants submitted requests for funding proposals to just three banks. Defendant Eagle did not himself pursue funding for the ESOP's purchase of 80/20 beyond this, despite an abundance of options. There was a robust capital market for senior and subordinated debt of ESOP companies at the time that a diligent and prudent trustee would have explored. Had Defendant Eagle made the effort, the ESOP could have secured additional or alternative funding.[3] Defendant Eagle instead put together an offer that relied on a seller's note from 80/20 to fund much of the company's sale price. While the offer was ultimately commercially reasonable, it could have, and should have, been made more attractive from the perspective of both the ESOP and the Foundation with the exercise of ordinary diligence and prudence.

75.     Defendant Eagle further failed to negotiate the sale of the Estate's stock to the ESOP in a prudent and diligent manner. Among other things, Defendant Eagle delayed providing information to the Estate and Foundation and overcompensated for the earlier delay by pushing to close the transaction immediately in a manner that left both the Estate and Foundation uncomfortable with the way in which the transaction was negotiated.

76.     The foregoing are just illustrative examples of Defendant Eagle's overarching fiduciary breaches in negotiating for the ESOP's purchase of the Estate's 80/20 stock. On information and belief, discovery will disclose additional examples.

---

[3] Indeed, the MPE Defendants raised their financing package (which consisted of senior and subordinated debt that doubled the amount of outside debt financing arranged by Defendant Eagle) using the same asset to back repayment that the ESOP had at its disposal—the company and its debt-free balance sheet and revenue projections.

77.    Nevertheless, in spite of Defendant Eagle's performance, the sale of 80/20 to the ESOP nearly closed in spring of 2020. By late April 2020, the ESOP had proposed commercially reasonable terms for the purchase of the Estate's shares that satisfied the requirements of Don Wood's will and the buy-sell agreement. All involved understood that a commercially reasonable offer put forward by the ESOP entitled the ESOP to purchase the shares of 80/20 stock held by the Estate. The parties had begun making arrangements to close the sale.

78.    But contrary to the ESOP's rights, the Estate and the Foundation pulled the plug on the deal in early May 2020 based on dissatisfaction with the financing Defendant Eagle had arranged for the deal and discomfort with the way Defendant Eagle had negotiated the deal. The Estate and Foundation then announced they would suspend negotiations with the ESOP and shop the company to third-party buyers.

79.    Defendant Eagle countered with an offer for the ESOP to purchase a controlling interest in 80/20 from the Estate and allow the remainder to be shopped to third-party buyers. But the Estate and the Foundation rejected this offer and stood by their decision to suspend negotiations with the ESOP.

80.    The sale of the Estate's 80/20 stock to the ESOP would have closed in early 2020, if not sooner, had Defendant Eagle acted in the transaction with prudence and diligence.

81.    Moreover, the actions by the Estate and Foundation contravened the ESOP's rights. But Defendant Eagle took no steps, in court or otherwise, to enforce the ESOP's right to buy the Estate's shares of 80/20 stock under Don Wood's will or the buy-sell agreement. A diligent and prudent fiduciary would have done so. Had Defendant Eagle enforced the ESOP's rights, the ESOP would have purchased the Estate's shares of 80/20 stock by at least early 2020.

82.     Defendant Eagle further knew that the Foundation, with Defendants Wood and Buesching at the helm, controlled the disposition of the Estate's shares of 80/20 stock, and that Defendants Wood and Buesching had directed or acquiesced in the decision to pull the plug on the sale of 80/20 to the ESOP. Despite knowing that these individuals had violated their fiduciary duties to the ESOP by acting on behalf of the Foundation in the transaction, Defendant Eagle failed to take any steps to remedy those breaches. Had Defendant Eagle acted to remedy those breaches, the ESOP would have purchased the Estate's shares of 80/20 stock by early 2020.

83.     For their part, Defendants Wood and Buesching failed to intercede as Defendant Eagle, the trustee appointed to negotiate the deal on behalf of the ESOP, failed to adequately perform his duties. Defendants Wood and Buesching instead exploited this failure as an excuse to seek more money through a sale of the stock held by the Estate to an outside buyer.

84.     Defendant Wood was beset by conflicts. He was away from the company for more than a decade before reluctantly returning as chairman at the end of Don Wood's life (pursuant to the company's succession plan). He did not support the employee ownership culture that the company built in his absence and disagreed with his father's will that the ESOP should own the company. Defendant Wood's personal predilection was to prioritize the interests of the Foundation above those of the ESOP, and he acted to secure the best deal for the Foundation, even if that deal came at the ESOP's expense. He therefore had personal reasons to reject the ESOP's purchase of 80/20, even if it meant violating the ESOP's rights and his fiduciary duties.

85.     Defendant Buesching was similarly conflicted. His loyalties were divided as between the Foundation (of which he was a trustee), the company (of which he was CEO), and the ESOP (of which he was a fiduciary). The interests of each entity diverged from the others in the sale of the Estate's shares of 80/20 stock. A sale of 80/20 to a third party further raised the

prospect of management incentives that would benefit Defendant Buesching personally. Like Defendant Wood, he had personal reasons for rejecting the ESOP's offer and suspending talks.

86.     The personal conflicts of Defendants Wood and Buesching interfered with their performance of their duties to the ESOP, which required that they seek to rectify Defendant Eagle's breaches of his fiduciary duties and avoid harming the ESOP's interests in the sale by virtue of their personal conflicts. Had Defendants Wood and Buesching performed their duties with the requisite loyalty, prudence, and diligence, the ESOP would have purchased the shares of 80/20 stock held by the Estate by early 2020.

87.     After backing out of the ESOP deal, the Estate and Foundation undertook a process to shop 80/20 to third-party buyers. But in doing so, they stacked the deck against the ESOP. The Estate hired a financial advisor to create and implement the sale process. With the knowledge and approval of Defendants Wood and Buesching, the terms of the engagement created a strong financial incentive to steer the sale away from the ESOP and towards a third-party buyer. Defendants Wood and Buesching thus further subordinated the interests of the ESOP to their own competing personal interests.

88.     Defendants Wood and Buesching participated in the process of soliciting and negotiating bids from third-party buyers on behalf of the Foundation and Estate, continuing their pattern of acting adverse to the ESOP in the sale.

89.     Defendants Buesching, Mauk, and Strack further participated in the process of soliciting and negotiating bids from third-party buyers on behalf of 80/20, and in doing so again acted in an adverse capacity to the ESOP. Indeed, not only did they participate in this process on behalf of the company, they solicited and negotiated personal benefits for themselves.

90.     The Estate and Foundation eventually settled on an offer by the MPE Defendants and negotiated its terms over several months. Defendants Wood, Buesching, Mauk, and Strack all took part in those negotiations adverse to the ESOP. As part of those negotiations, Defendants Buesching, Mauk, and Strack, negotiated to receive management incentives if the sale to the MPE Defendants went through, including transaction bonuses and equity interests in the post-acquisition company—monies and equity interests that otherwise would have, and should have, belonged to the ESOP and its participants.

91.     Defendants Wood, Buesching, Mauk, and Strack used the ESOP's assets as a bargaining chip in these negotiations. The MPE Defendants ultimately resolved to purchase 100% of 80/20's stock, including the stock held by the ESOP, and thus made the ESOP's sale of its stock a required term for the deal. Defendants Wood, Buesching, Mauk, and Strack agreed to cause the ESOP to sell its stock as part of the deal to further their personal interests. They further agreed to cause the ESOP to relinquish its valuable rights and legal claims related to the purchase of the Estate's shares of 80/20 stock without consideration to facilitate the MPE deal.

92.     During the negotiations, the MPE Defendants were specifically informed that it had been Don Wood's intent that the Estate sell its 80/20 stock to the ESOP. The MPE Defendants further received Don Wood's will and the buy-sell agreement, both of which confirmed the ESOP's right to purchase the Estate's shares of 80/20 stock.

93.     Meanwhile, in August 2020, the Estate and Foundation solicited an updated bid from the ESOP for the Estate's shares of 80/20 stock. But Defendant Eagle failed to take diligent and prudent steps to improve the ESOP's offer.

94.     For example, despite the concerns expressed by the Estate and Foundation regarding the financing Defendant Eagle had secured for the transaction in May 2020, Defendant

Eagle failed to seek additional or alternative financing between May 2020 and September 2020, when he submitted the ESOP's updated bid. He instead relied even more heavily on the seller's note from 80/20 about which the Estate and Foundation had complained when they suspended negotiations with the ESOP in early 2020. While the offer remained commercially reasonable and was more than adequate to meet the funding needs of the Foundation, it could have, and should have, been made more attractive from the perspectives of both the ESOP and the Foundation with the exercise of reasonable prudence and diligence. Defendant Eagle thus failed to take advantage of this last potential opportunity to salvage the deal.

95.    On information and belief, discovery will produce additional examples of Defendant Eagle's lack of prudence and diligence in preparing the ESOP's revised offer.

96.    Shortly after Defendant Eagle submitted the ESOP's revised offer in September 2020, the Estate and Foundation (under the leadership of Defendants Wood and Buesching) rejected the offer and terminated negotiations with the ESOP.

97.    Once again, Defendant Eagle failed to assert the ESOP's rights under Don Wood's will and the buy-sell agreement. And again, although he was aware of the conflicts of Defendants Wood, Buesching, Mauk, and Strack in the transaction, he took no steps to address their breaches of their fiduciary duties to the ESOP. A diligent and prudent trustee would have done both and secured the ESOP's investment.

98.    For their part, Defendants Wood, Buesching, Mauk, and Strack took no steps to intervene as Defendant Eagle, the trustee appointed to negotiate on behalf of the ESOP in the transaction, again breached his fiduciary duties of diligence and prudence in the transaction. Their personal conflicts again prevented them from meeting their fiduciary duties to the ESOP.

99.     The Estate and Foundation then formally agreed to sell 80/20 to the MPE Defendants rather than to the ESOP. This decision was personally approved by Defendants Wood and Buesching, whose approvals were necessary for the deal to proceed. The Estate and Foundation did not give the ESOP the opportunity to match the MPE Defendants' terms, even though the ESOP had already agreed to match the share price offered by the MPE Defendants. In October 2020, the Estate entered into an exclusivity agreement with agents of the MPE Defendants, confirming its intention to terminate negotiations with the ESOP.

100.    The Estate and Foundation (including Defendants Wood and Buesching) knew that this was contrary to Don Wood's wishes and instructions. Not only had Don Wood intended for the ESOP to purchase his stake in 80/20 following his death, he had made clear to those entrusted with administering his Estate that he did not intend a controlling interest in the company to be sold to a third party, and that it was crucial to ensure that the company remained locally owned. Instead, the company Don Wood founded would be sold to a private equity firm with its closest office hundreds of miles from Columbia City, IN.

*Closing the Deal and Terminating the ESOP's Rights*

101.    In December 2020, Defendant Wood and the board removed Defendant Eagle as the discretionary trustee of the ESOP and re-appointed Defendant Eagle as a directed trustee with authority only to join the Estate in a sale of the company to the MPE Defendants. Defendant Wood and the board further appointed the ESOP committee to direct Defendant Eagle with respect to the redemption of the ESOP's stock as part of the MPE deal and the termination of the ESOP's rights and claims related to the 80/20 stock held by the Estate.

102.    ERISA fiduciaries may not follow instructions that are contrary to ERISA. Accordingly, notwithstanding the limited nature of Defendant Eagle's re-appointment, his directions confirmed that he was required to "exercise his independent discretionary judgment

24

. . . in accordance with . . . ERISA" and "determin[e] after due diligence whether . . . [he] can, under applicable law, consummate" the transaction.

103.    Defendants Wood, Buesching, Mauk, and Strack structured the process in this manner to ensure they could deliver on their promise to convey the stock held by the ESOP to the MPE Defendants and to terminate the ESOP's acquisition rights as part of the MPE deal. Defendants Buesching, Mauk, and Strack comprised a controlling majority block of the ESOP committee. They had taken part in negotiating the MPE deal and had already agreed to use their fiduciary positions to cause the ESOP to sell its stock to the MPE Defendants and to relinquish its rights and claims related to the purchase of the Estate's 80/20 stock. Their vote on behalf of the ESOP was therefore a foregone conclusion.

104.    Driving their agreement was that each of Defendants Buesching, Mauk, and Strack had secured personal compensation that was contingent on the MPE deal closing. Each would be paid a substantial transaction bonus if and when the MPE deal closed. And each had been offered equity in the post-acquisition company by the MPE Defendants. The latter meant that Defendants Buesching, Mauk, and Strack effectively acted as both seller and buyer in the MPE deal, and used their fiduciary powers to usurp the ESOP's investment for themselves.

105.    The MPE deal would only close if the ESOP consented to sell its stock alongside the Estate and relinquish its acquisition rights and claims. This meant Defendants Buesching, Mauk, and Strack would only receive their bonuses and equity if they used their fiduciary powers to cause the ESOP to sell its stock and release its rights and claims. The MPE Defendants and Defendant Wood offered these inducements only to Defendants Buesching, Mauk, and Strack, and not to other 80/20 officers or employees. This was no coincidence.

106.    Defendants Buesching, Mauk, and Strack obliged Defendant Wood and the MPE Defendants and delivered the ESOP's stock to the MPE Defendants. In February 2021, as the MPE deal closing process began, Defendants Buesching, Mauk, and Strack directed Defendant Eagle to sell the ESOP's stock to the MPE Defendants alongside the Estate.

107.    Defendants all recognized that the ESOP had been denied its rights under Don Wood's will and the buy-sell agreement to purchase the shares of 80/20 stock held by the Estate. Defendants likewise recognized that the ESOP had strong legal claims and substantial damages associated with the violation of those rights. Accordingly, Defendants Wood, Buesching, Mauk, and Strack, along with the MPE Defendants, agreed that another condition of closing for the MPE deal would be the ESOP's waiver and release of its rights and claims.

108.    Accordingly, at the same time they directed Defendant Eagle to sell the ESOP's stock, Defendants Buesching, Mauk, and Strack also directed Defendant Eagle to execute an agreement to waive the ESOP's right to purchase the Estate's shares of 80/20 stock and to release its associated legal claims under Don Wood's will and the buy-sell agreement. The ESOP received no consideration at all for the waiver and release of its valuable rights and claims.

109.    Defendants Buesching, Mauk, and Strack took these actions without meaningful involvement from the two ESOP committee members who did not have personal incentives tied to the deal, including Plaintiff Walther. They did not disclose their conflicts to Plaintiff Walther, and she was not aware of any conflicts until after the deal closed and the ESOP terminated. Defendants Buesching, Mauk, and Strack further did not explain that the ESOP governance structure had been revised to nominally grant the committee discretion to reject the deal. Instead, they presented the decision to sell the ESOP's shares as having already been made outside of the ESOP committee. Practically speaking, the decision *was* made outside the ESOP committee, as

Defendants Buesching, Mauk, and Strack had personally negotiated the MPE deal on behalf of 80/20 and themselves, and had already agreed to vote in favor of the transaction, leaving nothing for the rest of the committee to decide.

110.    Notwithstanding Defendants Buesching, Mauk, and Strack's directions, Defendant Eagle retained the authority to reject the MPE deal on behalf of the ESOP. Because the MPE deal was contingent on the redemption of the ESOP's shares of 80/20 and the release of its acquisition rights and claims, this would have prevented the Estate from selling its shares to the MPE Defendants and preserved the ESOP's right and ability to purchase that stock.

111.    Under the circumstances, Defendant Eagle was under a duty to reject the sale of the ESOP's stock and the release of the ESOP's rights and claims. The MPE deal was tainted by wide-ranging fiduciary misconduct of which Defendant Eagle was aware. Among other things, Defendant Eagle knew of the extensive self-dealing by the ESOP's fiduciaries, that the deal constituted a prohibited transaction in numerous respects, that the deal would cut off the ESOP's right to purchase the Estate's 80/20 stock to the detriment of the ESOP and its participants, that the ESOP was not fairly compensated in the MPE deal, and that the ESOP was faced with this unfair deal due in part to his own fiduciary breaches. To approve the disposition of the ESOP's stock and the release of its rights and claims constituted a clear violation of ERISA. Defendant Eagle approved both anyway.

112.    Defendant Wood appointed Defendants Eagle, Buesching, Mauk, and Strack to their fiduciary positions and thus assumed a fiduciary duty to monitor them. Defendant Wood was aware of the fiduciary breaches by those he appointed to serve the ESOP. But Wood again did not intercede or seek to prevent or remedy these fiduciary breaches in any way. Indeed, he himself fostered and encouraged those breaches and acted on behalf of the Estate to violate the

ESOP's rights. Defendant Wood orchestrated the transaction to achieve his desired result at the expense of the ESOP, using his fiduciary appointment power and control of a counterparty to ensure the MPE deal would go through. Defendant Wood was also involved in negotiating the improper inducements offered to the ESOP's fiduciaries to secure their support. Defendant Wood thus not only failed to ensure that his appointed fiduciaries performed their fiduciary duties in connection with the MPE deal—he affirmatively ensured that they did not.

113.    Moreover, shortly before the MPE deal closed, Defendant Buesching assumed a seat on 80/20's board. In doing so, he too assumed a duty to monitor Defendants Eagle, Mauk, and Strack, and to remove them from their positions if they failed to meet their fiduciary duties. Despite his firsthand knowledge of their fiduciary breaches, Defendant Buesching did not remove them from their positions, but rather personally joined in their breaches.

114.    Having received the necessary approvals, the MPE deal was primarily effectuated through two contracts dated February 24, 2021: (1) a Stock Redemption Agreement, signed by Defendant Eagle on behalf of the ESOP and by Defendant Buesching on behalf of the company, through which 80/20 redeemed the shares of stock held by the ESOP; and (2) an Equity Purchase Agreement, through which the MPE Defendants acquired the Estate's stake in the company and the ESOP's interest in the company following its redemption by 80/20.

115.    The Stock Redemption Agreement and Equity Purchase Agreement cross-referenced each other and were bound together into a single transaction. Both were part of a single closing binder for what the parties understood to be a single, unified sale of 80/20's stock to the MPE Defendants.

116.    The Equity Purchase Agreement dictated the form of the Stock Redemption Agreement and explicitly incorporated the Stock Redemption Agreement by reference.

Execution and delivery of the Stock Redemption Agreement confirming the redemption of the ESOP's shares was a condition of closing for the Equity Purchase Agreement, as was the termination of the ESOP following the redemption of its 80/20 stock. Closing under the Equity Purchase Agreement was also contingent on ancillary documents and agreements, including Defendant Eagle's agreement to release the ESOP's acquisition rights and claims.

117.    The terms of both the Stock Redemption and Equity Purchase Agreements were negotiated together by Defendants Wood, Buesching, Mauk, and Strack, the MPE Defendants, and their advisors. Defendants uniformly referred to the redemption of the ESOP's stock as the first step of the closing process for the MPE deal, not a separate transaction.

118.    On or around March 2, 2021, after the MPE deal closed, company leadership gathered employees for an announcement. They introduced representatives from MPE and revealed that the company had been sold to the MPE Defendants.

119.    Employees reacted to the announcement with silence and exchanged confused looks. They had expected to be told that *the ESOP* had completed its planned acquisition of the company. Instead, they heard the opposite—the ESOP would be terminated and would not own any part of the company going forward.

120.    For many 80/20 employees, who took great pride in their ownership of 80/20 through the ESOP, the news was personally devastating. Defendants understood that the MPE deal would meet strong opposition by the participants of the ESOP. Indeed, Defendants went out of their way to structure the sale of the ESOP's stock to avoid giving the ESOP's participants notice of the MPE deal or an opportunity to object.

*Injuries to the ESOP and its Participants*

121.    The ESOP and its participants lost tens of millions of dollars as a result of Defendants' fiduciary breaches. Their injuries continue to accrue to this day.

29

122.    First, Defendants' fiduciary breaches caused the ESOP and its participants to lose a valuable investment that would have generated millions of dollars in capital gains and greatly increased the retirement savings of the ESOP's members.

123.    Unlike many companies that suffered during the COVID-19 pandemic, 80/20 adapted early in the pandemic and saw increased demand for its products, which led it to prosper and grow in the face of strong economic headwinds. Indeed, the company enjoyed record sales in 2020, surpassing its own previous high-water marks month after month. As a result, the value of 80/20's stock grew substantially between spring 2020 and March 2021.

124.    The ESOP was entitled to, and nearly did, purchase the Estate's shares of 80/20 stock before 80/20 experienced this burst of prosperity and rapid growth. It thus would have, and should have, bought the Estate's shares of 80/20 stock at a point shortly before the fair market value of the company and its stock increased by as much as $40 million. This would have translated to a roughly $36 million gain on the stock purchased from the Estate in the first year alone. But Defendants' fiduciary breaches caused the ESOP and its members to lose this lucrative investment in early 2020 that would have immediately appreciated.

125.    This loss harmed the individual accounts of Plaintiffs and other ESOP participants. Had the sale of the Estate's shares to the ESOP concluded in early 2020, the company's substantial cash reserves would have been distributed to shareholders, including the ESOP, which owned 10% of 80/20. The ESOP necessarily would have put this cash toward the purchase of new shares from the Estate or to pay down debt related to the shares acquired in 2017, releasing additional shares to ESOP participants in proportion to the debt paydown. In either case, shares acquired or released through the ESOP's use of its distribution of excess cash would have resulted in the prompt allocation of additional shares to the individual accounts of

Plaintiffs and other ESOP participants, increasing the value of their individual accounts. By early 2021, those additional shares would have already appreciated in value considerably, further increasing the value of the individual accounts of Plaintiffs and other ESOP participants.

126.    The benefits to Plaintiffs and other ESOP participants would have quickly compounded. The company's success in 2020 would have allowed the company to make its minimum contributions and pay dividends to further pay down ESOP loans for the shares acquired in 2017 and the shares acquired from the Estate.[4] This would have resulted in additional share allocations to the individual accounts of Plaintiffs and other ESOP participants, further increasing the value of their accounts. The company's rapid increase in value by early 2021 would have yielded additional gains for Plaintiffs' accounts and the accounts of other ESOP participants. ESOP participants thus lost millions of dollars in retirement benefits in just the first year following the ESOP's failure to purchase the Estate's shares of 80/20.

127.    The company continued to build on its momentum in 2021, 2022, and 2023, and the equity value of its stock continued trending upward. Assuming 80/20 had even half the success between 2021 and 2023 that it experienced between 2020 and 2021, the capital gains the ESOP would have enjoyed absent Defendants' fiduciary breaches and prohibited transactions total tens of millions since the company was sold in 2021. Those damages continue to mount and are felt by Plaintiffs and other ESOP participants, as the shares allocated to their individual accounts would have continued to increase in value, and new shares would have been allocated to employees in 2021, 2022, and 2023 following periodic contributions and dividends made possible by the company's success.

---

[4] This would be consistent with company practice. The company used contributions and dividends to accelerate the release of shares to participant accounts after the ESOP's acquisition of 10% of the company in 2017.

128.    Had Defendants not derailed and usurped the ESOP's purchase of the Estate's shares of 80/20 stock, the ESOP would have continued to hold and allocate 80/20 stock for the benefit of the ESOP's participants today. The ESOP's participants would hold more 80/20 stock today than they did when their accounts were forcibly liquidated as a result of the MPE deal, and the value of that stock would be higher.[5]

129.    Defendants' fiduciary breaches and prohibited transactions also financially harmed the ESOP and its participants by shorting them millions of dollars in the MPE deal.

130.    The ESOP's assets included not only its shares of 80/20 stock, but its legal claims and rights. Those included known legal claims related to the usurpation of the ESOP's right to purchase the shares of 80/20 stock held by the Estate. Defendants explicitly acknowledged that the ESOP possessed such claims by directing Defendant Eagle to relinquish them in closing the MPE deal, and by making the release of those claims a condition of closing the MPE deal.

131.    Those legal claims were strong and valuable. The ESOP could have blocked the MPE deal and obtained specific performance or damages for the ESOP by asserting them. Given the appreciation in value of 80/20, those potential damages totaled tens of millions of dollars.

132.    But those claims were not factored into the price paid to the ESOP in the MPE deal. The ESOP did not receive a cent in exchange for executing the waiver and release of its right to purchase the Estate's 80/20 stock. A fair transaction for the ESOP would have included, at minimum, a substantial payment in exchange for the settlement and release of the ESOP's claims commensurate with the ESOP's losses, and this additional amount would have been

---

[5] Notably, the termination of the ESOP was not contemplated until the MPE Defendants insisted on it as a condition of the MPE deal. Indeed, the sale and bidding process for the Estate's shares of 80/20 stock prioritized buyers who would maintain the ESOP. The MPE Defendants initially represented they would maintain and even grow the ESOP before changing course and demanding its termination.

allocated to the individual accounts of Plaintiffs and other ESOP participants and distributed to them in connection with the termination and liquidation of the ESOP.

133.    Defendants Buesching, Mauk, and Strack further received transaction bonuses and equity to secure their votes in the MPE deal. The financial benefits that these Defendants received in the deal represented value that the MPE Defendants were willing to forgo in order to obtain the ESOP's shares and bring 100% of the company under their control. The Officer Defendants also used and disposed of ESOP assets—its 80/20 shares and its acquisition claims—in order to obtain these personal financial benefits.

134.    The value these Defendants personally received in the MPE deal belonged to the ESOP, and equivalent consideration should have been received by the ESOP and not diverted to the Plan's fiduciaries and parties in interest. This diverted value was not factored into the price paid to the ESOP, and if it had been, it would have been allocated to the individual accounts of Plaintiffs and other ESOP participants.

*MPE's Liability*

135.    The MPE Defendants knew that the ESOP had the right to buy the Estate's shares. They were provided copies of Don Wood's will and the buy-sell agreement in connection with the MPE deal, and were explicitly informed that it was Don Wood's intent before he died that the ESOP purchase his stake in 80/20. The MPE Defendants further conditioned the MPE deal on the ESOP's waiver of its right to buy the Estate's shares and its release of related legal claims.

136.    The MPE Defendants knowingly interfered with the ESOP's rights under Don Wood's will and the buy-sell agreement by offering Defendants Buesching, Mauk, and Strack bonuses and equity incentives to steer the deal toward them and release the ESOP's acquisition rights. The MPE Defendants knew that their co-Defendants violated their fiduciary duties to the ESOP by failing to exercise or enforce the ESOP's rights and by causing the ESOP to instead

relinquish those rights and sell its shares for the MPE Defendants' benefit, and for the personal benefit of Defendants Buesching, Mauk, and Strack.

137.    The MPE Defendants further understood that the MPE deal was as a prohibited transaction under ERISA. Among other things, they understood that (1) fiduciaries of the ESOP would receive improper benefits in connection with the transaction; (2) fiduciaries of the ESOP had stood on both sides of the negotiating table; and (3) the ESOP was not compensated for the loss of its valuable rights.

138.    The MPE Defendants received substantial benefits from the deal in the form of equity interests in the company and subsequent profits distributions, realized and unrealized gains, and other rights of ownership. The MPE Defendants knew that they received these benefits due to their own efforts to interfere with the ESOP's rights and due to their co-Defendants' violations of ERISA.

*The Relationship Between the MPE Entities*

139.    Morgenthaler Private Equity Partners is a private equity firm that acquires businesses operating in the areas of manufacturing and commercial and industrial services.

140.    Businesses the firm acquires are owned by funds the firm controls, including MPE Partners II, L.P., and MPE Partners III, L.P.

141.    Partners and associates of the firm negotiated the purchase of 80/20, with the initial letter of intent formally issued by an entity they control called MPE MGT Co., LLC.

142.    The firm created Pareto Efficient Solutions, LLC, as a subsidiary of MPE Partners II, L.P. and MPE Partners III, L.P., a month before the sale of 80/20 closed.

143.    Pareto exists solely on paper. Its address, according to the Equity Purchase Agreement, is the Cleveland office of Morgenthaler Private Equity Partners, which is also the

address of MPE Partners II, L.P., and MPE Partners III, L.P. The officer who signed that Agreement on Pareto's behalf is a partner of Morgenthaler Private Equity Partners. Every other officer of Pareto, including its President, Vice President, Secretary, and Treasurer is a partner of Morgenthaler Private Equity Partners. Every individual involved in negotiating the purchase of 80/20 on behalf of Pareto was a partner or associate at Morgenthaler Private Equity Partners, including several individuals who have no formal affiliation with Pareto. At all relevant times, Morgenthaler Private Equity Partners held itself out as controlling the purchasing entities.

144.   The website of Morgenthaler Private Equity Partners lists 80/20 as part of its "Current Portfolio" of companies, and states that the company is owned by its MPE Partners II, L.P. and MPE Partners, III, L.P. funds, with no mention of Pareto. Upon closing of the MPE deal, Morgenthaler Private Equity Partners issued a press release (which again does not mention Pareto) stating that the firm had purchased 80/20.

145.   Pareto does not have operations separate from its owners, MPE Partners II and MPE Partners III. All three entities are centrally controlled, do not operate at arm's length, do not observe corporate formalities, and have the same officers and directors.

146.   Pareto was created solely for the purpose of deliberate misconduct—*i.e.*, to participate in, facilitate, and hold undue profits of the ERISA violations at issue in this case.

147.   MPE Partners II and MPE Partners III hold the ill-gotten equity of 80/20 through their ultimate ownership and control of Pareto, which holds that equity directly.

### PLAN-WIDE RELIEF

148.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the ESOP to bring an action on behalf of the ESOP to obtain for the ESOP the remedies provided by 29

U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the ESOP pursuant to this statutory provision in addition to 29 U.S.C. § 1132(a)(3).

149.    Plaintiffs seek recovery for injuries to the ESOP sustained as a result of prohibited transactions and fiduciary breaches and seek equitable relief on behalf of the ESOP as a whole pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(3).

150.    Plaintiffs are adequate to bring this derivative action on behalf of the ESOP, and their interests are aligned with other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the ESOP.

## CLASS ACTION ALLEGATIONS

151.    Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

152.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the ESOP defined as follows:

> All participants and beneficiaries of the ESOP after Don Wood Died, excluding any Defendant or employee of 80/20 who received an equity interest in the company or a bonus as a result of the MPE deal.

153.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The ESOP had around 350 participants.

154.    <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were ESOP participants, and Plaintiffs suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class

members with regard to the ESOP. Defendants' improper actions affected all ESOP participants similarly.

155.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

156.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.    Whether Defendants Wood, Eagle, Buesching, Mauk, and Strack were fiduciaries with respect to the ESOP;

b.    Whether Defendants Wood, Eagle, Buesching, Mauk, and Strack breached their fiduciary duties to the ESOP;

c.    Whether Defendants Wood, Eagle, Buesching, Mauk, and Strack had a fiduciary duty to exercise or enforce the ESOP's rights to purchase the shares of 80/20 stock held by the Estate;

d.    Whether the redemption of the ESOP's shares benefited parties in interest to the ESOP through equity interests in the post-ESOP company and bonuses;

e.    Whether the ESOP received adequate consideration in the MPE deal;

f.    Whether the MPE Defendants knowingly participated in ERISA violations by the ESOP's fiduciaries;

g.    The proper form of equitable and injunctive relief; and

h.    The proper measure of monetary relief.

157.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members.

158.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not party to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as granting interests in specified property to the ESOP or ESOP participants, would be dispositive of the interests of all Class members.

159.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing individual actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single case.

160.    Plaintiffs and their undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

**CAUSES OF ACTION**

**Count I**
**29 U.S.C. § 1106(b)**
**29 U.S.C. § 1105(a)**
*Against Defendants Wood, Eagle, Buesching, Mauk, and Strack*

161.    Plaintiffs incorporate the foregoing paragraphs by reference.

162.    Defendants Wood, Eagle, Buesching, Mauk, and Strack were fiduciaries of the ESOP throughout the relevant period.

163.    Defendants Buesching, Mauk, and Strack dealt with assets of the ESOP in their own interest, in violation of 29 U.S.C. § 1106(b)(1), by causing the ESOP to dispose of its assets as a contingent component of a transaction in which they understood they would receive personal consideration including equity interests in Defendant Pareto and cash bonuses.

164.    Defendants Buesching, Mauk, and Strack further violated 29 U.S.C. § 1106(b)(2) by acting adverse to the ESOP in the transaction. By negotiating equity interests in Defendant Pareto as part of the transaction, these Defendants became both representatives of the seller and buyers on the other side of the transaction. These Defendants further acted adverse to the ESOP in negotiating on behalf of 80/20 in the MPE deal.

165.    Defendants Buesching, Mauk, and Strack also violated 29 U.S.C. § 1106(b)(3) by receiving consideration for their personal accounts in a transaction involving the ESOP by virtue of the personal benefits they received in the MPE deal.

166.    Defendants Wood and Buesching dealt with assets of the ESOP in their own interest, in violation of 29 U.S.C. § 1106(b)(1), by using the ESOP's assets as a bargaining chip in negotiating a transaction for the benefit of the Foundation.

167.    Defendants Wood and Buesching violated 29 U.S.C. § 1106(b)(2) by acting on behalf of the Estate and Foundation in the sale of the Estate's 80/20 stock and standing on both sides of the transaction. The Estate and Foundation were adverse to the ESOP in the sale of the Estate's 80/20 stock. Defendants Wood and Buesching nonetheless acted on behalf of the Estate and Foundation by directing the Estate with respect to the ESOP's offers and the Estate's counteroffers, directing the Estate with respect to the decision to sell its stock to the MPE Defendants rather than to the ESOP, extracting a release from the ESOP for the benefit of the Estate and Foundation, and agreeing to condition the Estate's sale on the ESOP joining the sale as seller. Meanwhile, Defendants Wood and Buesching acted on behalf of the ESOP in the same transaction, appointing, removing, and directing the ESOP fiduciaries authorized to negotiate the ESOP's purchase of the Estate's shares, to sell the ESOP's shares, and to waive and release the ESOP's rights and claims related to the purchase of the Estate's shares.

168.    Defendant Eagle is liable for the foregoing violations as a co-fiduciary of Defendants Wood, Buesching, Mauk, and Strack under 29 U.S.C. § 1105(a). Defendant Eagle was aware of the unlawful self-dealing and prohibited transactions described above. He did nothing to prevent or redress those fiduciary breaches. Instead, he ratified, assisted, and facilitated those breaches by acquiescing in these Defendants' refusal to sell the Estate's shares to the ESOP, failing to take any steps to address their self-dealing and remove them from the negotiation process, approving the MPE deal, and agreeing to release the ESOP's acquisition rights and claims, despite his understanding that the deal was contrary to ERISA.

169.    Defendant Wood is liable as a co-fiduciary for the violations of Defendants Buesching, Mauk, and Strack described above under 29 U.S.C. § 1105(a). Defendant Wood was aware of the self-dealing and prohibited transactions by Defendants Buesching, Mauk, and

Strack. Defendant Wood did nothing to prevent or redress those breaches. Instead, he ratified, assisted, and facilitated those breaches by negotiating the sale of the Estate's shares of 80/20 stock alongside them, appointing these Defendants to approve the MPE deal and definitively terminate the ESOP's acquisition rights, and by allowing them to maintain their roles in the transaction despite their personal interests that conflicted with the ESOP's.

170.    Defendants Buesching, Mauk, and Strack are liable as co-fiduciaries for the violations by Defendant Wood described above under 29 U.S.C. § 1105(a). Defendants Buesching, Mauk, and Strack were aware of Defendant Wood's self-dealing and prohibited transactions in acting on behalf of the Estate and Foundation but did nothing to prevent or redress those violations. Rather, they ratified, assisted, and facilitated those breaches by causing the Estate to decline to sell its shares of stock to the ESOP and approving the MPE deal, despite their knowledge that it was tainted by Defendant Wood's fiduciary breaches.

171.    The foregoing violations damaged the ESOP by (1) depriving it of its investment in the 80/20 stock held by the Estate; (2) disposing of the ESOP's rights to purchase the 80/20 stock held by the Estate and receiving no consideration for that release; and (3) diverting value that rightfully belonged to the ESOP in the MPE deal to its disloyal fiduciaries. The ESOP is entitled under 29 U.S.C. §§ 1109, 1132(a)(2), and 1132(a)(3) to recover its resulting losses and Defendants' resulting profits from these Defendants.

**Count II**
**29 U.S.C. § 1106(a)**
**29 U.S.C. § 1105(a)**
*Against Defendants Wood, Eagle, Buesching, Mauk, and Strack*

172.    Plaintiffs incorporate the foregoing paragraphs by reference.

173.    The redemption of the ESOP's stock by 80/20 violated 29 U.S.C. § 1106(a)(1)(A) and (D) because it constituted the sale of the ESOP's assets to a party in interest, 80/20, and was

also one component of a transaction that constituted the use of ESOP assets for the benefit of

Defendants Wood, Buesching, Mauk, and Strack, and the indirect transfer of ESOP assets to

Defendants Buesching, Mauk, and Strack, each of whom was a party in interest to the ESOP.

174.    Defendants Wood, Eagle, Buesching, Mauk, and Strack caused this prohibited

transaction in their capacities as ESOP fiduciaries responsible for orchestrating and approving

the redemption of the ESOP's stock and the release and waiver of the ESOP's acquisition rights

and claims. Each was aware of the unfairness of the MPE deal and the improper benefits the

MPE deal would confer on the ESOP's fiduciaries and parties in interest when they approved it.

175.    The transaction was not for adequate consideration. The ESOP received no

consideration for agreeing to waive its rights to purchase the 80/20 stock held by the Estate and

to release its related legal claims. A fair transaction would have included a substantial payment

for these assets to compensate the ESOP for its substantial losses. The equity and bonuses

Defendants Buesching, Mauk, and Strack received in the transaction further represent value

diverted from the ESOP to its disloyal fiduciaries. Moreover, the process for evaluating the

transaction was tainted by breaches of fiduciary duties detailed above.

176.    Defendants Wood, Eagle, Buesching, Mauk, and Strack caused losses to the

ESOP resulting from the above-mentioned prohibited transactions and are liable to the ESOP for

those losses, including by disgorgement of their unlawful personal gains in the transaction.

177.    Defendants Wood, Eagle, Buesching, Mauk, and Strack were each aware of the

fiduciary breaches of the others and failed to act to protect the ESOP. Instead, each of these

Defendants ratified and facilitated the fiduciary breaches of the others by permitting the

transaction to proceed. As such, each is liable as a co-fiduciary for the breaches of their fellow

fiduciaries.

<u>**Count III**</u>
**29 U.S.C. § 1104(a)(1)**
**29 U.S.C. § 1105(a)**
*Against Defendants Wood, Eagle, Buesching, Mauk, and Strack*

178.    Plaintiffs incorporate the foregoing paragraphs by reference.

179.    Defendant Wood, as board chair, was an appointing fiduciary under ERISA, with authority to appoint, monitor, and remove other ESOP fiduciaries.

180.    Defendant Eagle, as the ESOP's trustee, was a fiduciary under ERISA, with the powers allocated to him by plan documents and engagement agreements, and a duty to satisfy ERISA standards notwithstanding any contrary directions.

181.    Defendants Buesching, Mauk, and Strack were fiduciaries under ERISA tasked with exercising authority granted by Defendant Wood and the board to the ESOP committee. Defendant Buesching was also a fiduciary of the ESOP by virtue of his appointment to the board of 80/20 shortly before the MPE deal closed.

182.    Defendants Wood, Eagle, Buesching, Mauk, and Strack failed to act prudently or solely in the interest of ESOP participants in connection with their respective fiduciary duties to the ESOP.

183.    Defendant Eagle (1) failed to negotiate the ESOP's purchase of the Estate's shares of 80/20 stock in a diligent and prudent manner; (2) failed to assert the ESOP's rights under Don Wood's will and the buy-sell agreement; (3) ignored unlawful self-dealing and other fiduciary breaches by the other Defendants that injured the ESOP; (4) failed to negotiate compensation for the ESOP in the MPE deal in a diligent and prudent manner; (5) approved the MPE deal despite his knowledge that doing so would violate ERISA and harm the ESOP; and (6) agreed to waive the ESOP's right to purchase the Estate's 80/20 stock and release its related legal claims for no consideration, despite his knowledge that this would violate ERISA and harm the ESOP.

184.    Defendants Buesching, Mauk, and Strack (1) failed to take any steps to assert the ESOP's rights with respect to the purchase of the Estate's shares of 80/20 stock; (2) failed to act prudently and loyally in assessing whether to cause the ESOP to agree to sell its stock and in negotiating the terms of that transaction; (3) failed to act prudently and loyally in directing Defendant Eagle to approve the MPE deal; and (4) failed to act prudently and loyally in directing Defendant Eagle to waive the ESOP's right to purchase the Estate's shares of 80/20 stock and to release its associated legal claims. Defendant Buesching further failed to act prudently and loyally in connection with the ESOP's efforts to purchase the 80/20 stock held by the Estate.

185.    Defendant Wood appointed Defendants Eagle, Buesching, Mauk, and Strack to their fiduciary positions and had a duty to monitor their performance of their duties. Defendant Wood was aware of the foregoing breaches of fiduciary duty by those he appointed, but took no action to remedy those fiduciary breaches or to remove or replace his appointed fiduciaries. Rather, he ratified and incentivized those ERISA violations based on his personal interests.

186.    Had Defendants Wood, Eagle, Buesching, Mauk, and Strack performed their fiduciary duties in the prudent and loyal manner required by ERISA, the ESOP would have successfully acquired the shares of 80/20 held by the Estate at a favorable price or received substantial additional consideration in the MPE deal.

187.    Defendants Wood, Eagle, Buesching, Mauk, and Strack caused losses to the ESOP resulting from these fiduciary breaches and are liable to the ESOP for those losses. They are further liable for the unlawful gains they received in connection with their fiduciary misconduct.

188.    Defendants Wood, Eagle, Buesching, Mauk, and Strack were each aware of the fiduciary breaches of the others and failed to act to protect the ESOP. Instead, each of these

Defendants ratified and facilitated the fiduciary breaches of the others. As such, each is liable as a co-fiduciary for the breaches of their fellow fiduciaries.

**<u>Count IV</u>**
**29 U.S.C. § 1132(a)(3)**
*Against Defendants Buesching, Mauk, and Strack and the MPE Defendants*

189.    Plaintiffs incorporate the foregoing paragraphs by reference.

190.    Pursuant to 29 U.S.C. § 1132(a)(3), a participant may seek "appropriate equitable relief [] to redress [ERISA] violations[.]" Such "appropriate equitable relief" includes recovering proceeds of a fiduciary violation from a knowing participant in the violation. *See Harris Trust v. Solomon Smith Barney*, 530 U.S. 238 (2000).

191.    Defendants Buesching, Mauk, and Strack, and the MPE Defendants knew that that the transaction in which they obtained interests in 80/20 was a prohibited transaction under ERISA because (1) it constituted a use of the ESOP's assets for the benefit of fiduciaries and parties in interest; and (2) fiduciaries of the ESOP acted on behalf adverse parties (the Estate, the Foundation, and themselves) in the transaction.

192.    Defendants Buesching, Mauk, and Strack, and the MPE Defendants further knew that the transaction in which they obtained their interests in 80/20 resulted from breaches of fiduciary duty by Defendants Wood, Eagle, Buesching, Mauk, and Strack. The MPE Defendants knowingly and intentionally undermined those Defendants' fiduciary duties by offering improper benefits to ensure support for the MPE Defendants' acquisition of the company from the Estate and ESOP, in derogation of the ESOP's right to purchase 80/20. The MPE Defendants knew that the resulting deal violated Defendants Wood, Eagle, Buesching, Mauk, and Strack's respective fiduciary duties to act prudently and in the interest of the ESOP.

193.    Defendants Buesching, Mauk, and Strack, and the MPE Defendants now hold and enjoy the benefits of those violations of ERISA, in the form of their interest in 80/20's equity.

194.    Pursuant to principles of equity, as adopted and applied by federal courts in ERISA cases, Defendants Buesching, Mauk, and Strack, and the MPE Defendants must be denied any benefit from their knowing participation in the fiduciary breaches and prohibited transactions described above.

## **PRAYER FOR RELIEF**

195.    Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    Certify Plaintiffs' authority to seek plan-wide relief on behalf of the ESOP pursuant to 29 U.S.C. § 1132(a)(2);

B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as Class representatives, and certify their counsel as Class counsel;

C.    Order Defendants Wood, Eagle, Buesching, Mauk, and Strack to make good to the ESOP all losses resulting from their violations of ERISA, and disgorge any gains;

D.    Impose an equitable lien or constructive trust for the benefit of the ESOP and the Class on income distributions and capital gains received by or owed to Defendants Buesching, Mauk, and Strack and the MPE Defendants based on their equity interest in the company, and order an accounting of such distributions and gains, or alternatively, order recission of the contracts by which they acquired their interest in 80/20;

E.    Appoint an independent trustee to manage the collection of recovered sums, enforcement of equitable interests granted to the Class, and the allocation and distribution of recovered benefits;

F.    Approve a fair and equitable plan of allocation of any recovered benefits to the Class;

G.    Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

H.    Award prejudgment and post-judgment interest; and

I.    Award such other and further relief as the Court deems just and equitable.

Dated: January 5, 2024

**ENGSTROM LEE LLC**
/s/ *Charlie C. Gokey*
Charlie C. Gokey, MN. Bar No. 0402225*
Jennifer K. Lee, MN Bar No. 0399012*
Carl F. Engstrom, MN Bar No. 0396298^
729 N. Washington Ave., Suite 600
Minneapolis, MN 55401
Telephone: (612) 305-8349
jlee@engstromlee.com
cengstrom@engstromlee.com
cgokey@engstromlee.com

*Admitted to the bar of the U.S. District Court
for the Northern District of Indiana
^Admitted *Pro Hac Vice*

*ATTORNEYS FOR PLAINTIFFS*