## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| MARTHA WALTHER, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:23-CV-294-GSL-SLC |
| JOHN WOOD, et al., | |
| Defendants. | |

### OPINION AND ORDER

Former participants in a since terminated employee stock ownership plan ("ESOP"), brought this action alleging that several individuals and companies breached their fiduciary duties to the ESOP in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). Two motions to dismiss were filed. *See* [DE 65]; [DE 68].

For the following reasons, the motions are granted in part, and denied in part.

### Background

In 1986, Donald Wood founded 80/20, Inc. in Fort Wayne, Indiana. [DE 63, ¶ 1]. It manufactures pieces of aluminum that are assembled to create framing structures used in the automation industry, e.g., the structural frame that houses a robotic arm in a manufacturing plant. Its product became known as the "The Industrial Erector Set." [*Id.*, ¶ 3].

The business was very successful. By 2016, 80/20 employed 400 people at a 300,000 square-foot campus in Northeast Indiana. [*Id.*]. In recognition of his employees' role in this success, Donald Wood wanted to create an opportunity for employee ownership of 80/20. [*Id.*, ¶ 46]. On July 29, 2016, he took the first step and republished his will, adding the following codicil:

> I appoint LAKE CITY BANK, or its successor in interest, as my personal representative. If my estate owns an interest in 80/20, Inc., it is my intent that said interest be sold and I direct the personal representative of my estate to take all actions necessary to sell said interest in a commercially reasonable manner. In any such sale my preference would be to sell 80/20, Inc. to an employee stock ownership plan for the benefit of the employees of 80/20, Inc., and alternatively to a third-party purchaser.

[DE 63, ¶ 50]; [DE 69-2] (Codicil). At the time of this republication, Donald Wood was the president, sole director, and sole voting shareholder of 80/20. [DE 63, ¶ 45].

On December 29, 2016, the 80/20, Inc. Employee Stock Ownership Plan ("Plan") was created with a backdated effective date of January 1, 2016. [DE 63, ¶ 47]; [DE 66-1] (Plan Document). The Plan would be controlled by 80/20's directors, who had authority to appoint an independent trustee and the members of the Plan's committee ("Plan Committee"). [DE 63, ¶ 31]. As sole director at the time, Donald Wood appointed Brian Eagle, an Indianapolis attorney, as the independent trustee. [DE 63, ¶ 47]; [DE 66-3] (Trustee Agreement). This allowed Eagle to purchase, on behalf of the Plan, the 10% of 80/20's shares Donald Wood wished to sell to the Plan at that time.[1] [DE 63, ¶ 47]. By January 1, 2017, the Plan owned 10% of the Company. [*Id.*]. Finally, Donald Wood entered into an agreement with 80/20, Inc. titled, "Stock Purchase & Transfer Restriction Agreement" ("Buy-Sell Agreement"). [DE 63, ¶ 53]; [DE 66-4] (Buy-Sell Agreement). That agreement opens with the following:

> Wood owns ninety percent (90%) of the issued and outstanding Shares as set forth [herein]; Wood desires that at the time of his death, any Shares not purchased from his estate by the ESOP or by one or more Independent Third Parties within a reasonable period of time following his death, shall be sold to the Corporation, and the Corporation shall be obligated to purchase such Shares[.]

---

[1] To finance the transaction, the ESOP used the proceeds of a loan taken out by 80/20, with an agreement to repay the company in installments, using stock dividends and tax-deductible contributions that 80/20 would make to the ESOP. [DE 63, ¶ 48].

[DE 66-4]. Section 2.01 of the Buy-Sell Agreement outlines how the Plan, or alternatively a third party, is to receive an offer to purchase. For the Plan, it states:

> Upon the death of Donald F. Wood, Wood shall offer (in accordance with Section 6.01) to sell all or any portion of the Shares owned by Donald F. Wood at his death to the ESOP at the ESOP Purchase Price and upon the terms to be determined between Wood and the ESOP. The ESOP shall have one hundred eighty (180) days following the appointment of the personal representative of Donald F. Wood's estate within which to accept all or any part of the Shares so offered.

[DE 63, ¶ 53]; [DE 66-4, § 2.01(a)] (Buy-Sell Agreement). The shares may be offered to a third party following one of three triggering events: a closing of the Plan's purchase of any shares, written notice from the Plan that it does not desire to accept any shares, or the expiration of the 180-day offer period. [DE 66-4, § 2.01(b)] (Buy-Sell Agreement). Regardless of the buyer, the proceeds of the sale would go to the residual beneficiary of Donald Wood's estate ("Estate"), which was his charitable foundation ("Foundation"). [DE 63], ¶ 65.

In March of 2019, Donald Wood died. [*Id.*, ¶ 60]. At that time, two of 80/20's board members were also board members of the Foundation: John Wood, chairman of 80/20 and the Foundation; and Patrick Buesching, 80/20's CEO and both a trustee and the treasurer of the Foundation.[2] [*Id.*, ¶¶ 34, 36, 66]. Buesching was also the chairman of the Plan Committee, which included: Patrice Mauk, 80/20's CFO; and Rodney Strack, 80/20's executive director of sales. [*Id.*, ¶¶ 36-38]. Eagle remained the Plan's independent trustee. [*Id.*, ¶ 35].

Upon Donald Wood's death, the Estate and the Plan began preparing the sale of the Estate's shares in 80/20. [*Id.*, ¶ 64]. The Estate allowed the Foundation to direct the negotiations, as the Foundation stood to receive the proceeds of the sale. [*Id.*, ¶ 65]. Eagle, as trustee of the Plan, would represent the Plan in its purchase of the shares. [*Id.*, ¶ 70]. Eagle retained a valuation

---

[2] John Wood, one of Donald's sons and a co-founder of 80/20, returned to the company as chairman of the board of directors in the fall of 2018. [DE 63, ¶¶ 2, 34].

advisor, a necessary step for such a sale, eight months after Donald Wood's death. [DE 63, ¶ 73]. This was two months after the 180-day deadline referenced in the Buy-Sell Agreement. [*Id.*]. So, at the time that Eagle retained the advisor, the Estate and the Foundation were considering opening the negotiations to third-party buyers. [*Id.*].

Even so, on December 31, 2019, Buesching, Mauk, and Strack, on behalf of the Plan, submitted to three different banks requests for proposals on how the Plan could fund the purchase of the shares. [*Id.*, ¶ 74]. Though Eagle did not pursue additional funding options for the Plan's purchase of the shares, he created a commercially reasonable offer involving a seller's note from 80/20. [*Id.*]. Ultimately, the Estate and the Foundation rejected the offer in May of 2020. [*Id.*, ¶ 75, 78]. Eagle counteroffered, proposing that the Plan would only purchase a controlling interest of the shares with the remainder being sold to a third party. [*Id.*, ¶ 79]. The Estate and the Foundation rejected that offer, too. [*Id.*, ¶ 79].

The Estate hired a financial advisor to assist with sale to a third party. [*Id.*, ¶ 87]. John Wood and Buesching were involved in the solicitation and negotiation of bids on behalf of the Estate and the Foundation. [*Id.*, ¶ 88]. Buesching, Mauk, and Strack were involved with the same, but on behalf of 80/20. [*Id.*, ¶ 89]. MPE Partners II and MPE Partners III emerged as the most serious third-party purchaser, seeking to purchase 100% of 80/20's shares. [*Id.*, ¶¶ 90-91]. Negotiations on the structure of the deal proceeded in earnest, but the Estate and Foundation solicited one more offer from the Plan in August 2020. [*Id.*, ¶ 93]. Eagle submitted a bid, relying on the seller's note as he did with the initial bid from earlier that year. [*Id.*, ¶ 94]. This offer was rejected. [*Id.*, ¶ 96].

Instead, the deal with the MPE entities moved forward, with John Wood and Buesching approving an exclusivity agreement in October 2020. [*Id.*, ¶ 99]. Two months later, John Wood

and 80/20's board of directors removed Eagle as independent trustee of the Plan and reappointed him as a directed trustee with the limited authority to authorize 80/20's redemption of the 10% of shares owned by the Plan. [DE 63, ¶ 101]. This was necessary for 80/20 to then sell 100% of the shares to the MPE entities. On February 24, 2021, both contracts were executed: the stock redemption agreement between the Plan and 80/20, and the sale of 80/20 to Pareto Efficient Solutions, a subsidiary of the MPE entities. [*Id.*, ¶ 114]. As part of the sale, the Plan released any rights and claims related to the sale, and it was then terminated. [*Id.*, ¶ 116]. Following the close of the sale, Buesching, Mauk, and Strack received transaction bonuses and an equity stake in Pareto. [*Id.*, ¶¶ 36-38, 90].

Plaintiffs in this case represent a class of former Plan account holders, as well as the Plan itself. On July 14, 2023, they filed the instant action against John Wood, Eagle, Buesching, Mauk, Strack, MPE Partners II, MPE Partners III, and Pareto Efficient Solutions.[3] [DE 1]. Broadly, Plaintiffs allege that each defendant had a fiduciary responsibility to the Plan under ERISA, whether as a direct fiduciary or a co-fiduciary, and that each Defendant somehow breached its duties in the events leading up to the MPE Defendants' purchase of 80/20. [*Id.*].

On January 5, 2024, Plaintiffs filed the Second Amended Complaint ("SAC"), which is currently operative. [DE 63]. Defendant Wood filed an Answer [DE 67], Defendant Eagle filed a Motion to Dismiss [DE 65], and the Officer Defendants and MPE Defendants jointly filed a Motion to Dismiss [DE 68]. Both motions argue that Plaintiffs: lack standing because their injury, if any, is not fairly traceable to the defendants; failed to exhaust administrative remedies; and allege claims predicated on a nonexistent right to purchase the outstanding shares of 80/20.

---

[3] For the remainder of this Opinion, John Wood will be Defendant Wood; Defendants Buesching, Mauk, and Strack, together will be the Officer Defendants; and MPE Partners II, MPE Partners III, and Pareto Efficient Solutions will be the MPE Defendants.

Moreover, the will requires a commercially reasonable sale of the shares; it merely prefers that the sale goes to an ESOP or third party. Finally, Defendants argue that under the Buy-Sell Agreement, Plaintiffs were entitled to only an offer to purchase, not a right to purchase. The offer was timely made, and a commercially reasonable counteroffer was submitted by the Plan and subsequently rejected. Plaintiffs adjusted that offer, which was rejected. Defendants note that even though the negotiations with the MPE Defendants were permissible, they solicited another bid from the Plan, which was also rejected.

Plaintiffs argue that: their injuries flow from Eagle's mismanagement; there were no administrative remedies to exhaust, as the Plan was terminated; and the Officer Defendants' membership on the Plan's Committee, which constituted a majority, was an improper conflict as they also sat on the boards for the Foundation and 80/20.

Both motions are now before the Court and ripe for decision.

**<u>Legal Standard</u>**

### I.      12(b)(1) Motion to Dismiss

In response to a pleading, a party may move to dismiss the matter for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Standing is one essential piece of a court's subject matter jurisdiction." *Word Seed Church v. Village of Hazel Crest*, 111 F.4th 814, 822 (7th Cir. 2024) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992)). It is the plaintiff's burden to properly allege standing. *Crooks v. Household Finance Corp. III*, 2011 WL 3875803 at *1 (N.D. Ind. 2011). A plaintiff establishes the "irreducible constitutional minimum" of standing if the complaint alleges that the plaintiff suffered (1) an injury in fact, (2) that is fairly traceable to the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan*, 504

U.S., at 560-61. If, at the pleading stage, the plaintiff alleges facts demonstrating these elements, then the plaintiff has carried its burden of establishing standing.

In considering a Rule 12 motion challenging standing, a court "may look beyond the allegations of the complaint to evidence that calls the court's jurisdiction into question." *Crooks*, at *1 (citing *Bastuen v. AT&T Wireless Serv., Inc.*, 205 F.3d 983, 990 (7th Cir. 2000)).

## II.      12(b)(6) Motion to Dismiss

In response to a complaint, a party may file a motion to dismiss the action asserting that the pleading fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint will survive a 12(b)(6) motion if it contains allegations that state "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Under this plausibility standard, a court accepts "the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 681).

Per Rule 12(d), if matters outside the pleadings are presented to the court in a 12(b)(6) motion, and the court does not exclude those matters, the 12(b)(6) motion must be treated as one for summary judgment. Fed. R. Civ. P. 12(d). However, "a court may consider documents attached to a defendant's motion to dismiss, where those documents 'are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim.'" *Facebook, Inc. v. Teachbook.com LLC*, 819 F.Supp.2d 764, 773 (N.D. Ill. 2011) (quoting *Venture Associates Corp. v. Zenith Data*

*Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). "The court can properly consider such document[s] without converting the motion to dismiss to a motion for summary judgment." *Id.* (citing *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 n. 4 (7th Cir. 2003)).

### Discussion

Both motions to dismiss argue that Plaintiffs' claims lack standing. Generally, Defendant Eagle asserts that Plaintiffs' injury is not fairly traceable to him because he alone could not execute the purchase of the shares. He further argues that the injuries are too speculative because Plaintiffs assume that if the Plan had purchased some or all of 80/20's outstanding shares, the company's value would have increased in that situation, too. The Officer and MPE Defendants also contend that Plaintiffs' alleged injury is too speculative. Broadly, they argue that Plaintiffs' claim that their Plan accounts "would have been, and would continue to be, worth more had Defendants not violated ERISA" would be too difficult to ascertain. [DE 69, p. 22] (citing [DE 63, ¶¶ 19-25]). Plaintiffs argue that Defendant Eagle's dilatory conduct, in the time following Donald Wood's death, cost them the opportunity of a lost investment. They contend that these facts are sufficient to plead causation at this stage because the conduct is not too attenuated from the alleged injury.

As an initial matter, it is not enough for Plaintiff's to have a cause of action under ERISA; they must also have constitutional standing. *See Thole v. U.S. Bank N.A*, 590 U.S. 538, 544 (2020) ("This Court has rejected the argument that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" (internal citations omitted)). Though Plaintiffs here brought a cause of action under ERISA, they still must prove "(1) that they suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the

injury is fairly traceable to the defendants, and (3) that the injury would likely be redressed by the requested judicial relief. *Lujan*, 504 U.S., at 560-61.

First, the Court examines whether there is an injury in fact. The briefing highlights an important question: do Plaintiffs' claim that their injury arises from a right to purchase the shares? If so, did Plaintiffs have a right to purchase the shares, or merely a right to an offer to purchase? For an answer, the Court looks to the SAC. In the section titled, "Injuries to the ESOP and its Participants," Plaintiffs allege that the Plan was "entitled to" purchase the shares. [DE 63, ¶ 124]. Plaintiffs' claims that Defendants breached their fiduciary duties rest on the assertion that Defendants failed to enforce Plaintiffs' right to purchase. Despite distancing themselves from it in their briefing, Plaintiffs' contention that they had a right to purchase the shares is ever-present in the SAC. For example:

- "This case concerns an ESOP that had the opportunity and **legal right** to make a lucrative investment." [*Id.*, ¶ 1] (emphasis added);

- "[Don Wood] … gave the ESOP the **right to purchase** … the company … in a codicil to his will and in a buy-sell agreement[.]" [*Id.*, ¶ 4] (emphasis added);

- "Defendant Eagle … had a fiduciary duty … to enforce the ESOP's **right to purchase**[.]" [*Id.*, ¶ 10] (emphasis added);

- "[Defendant Wood] … caused the Foundation to refuse to honor the ESOP's **right to buy** the company[.]" [*Id.*, ¶ 11] (emphasis added); and

- "[Defendants Buesching, Mauk, and Strack] … cause[d] the ESOP to give up its **right to buy**[.]"). [*Id.*, ¶¶ 12-13] (emphasis added).

In further support of this right to purchase, Plaintiffs argue that the codicil and the Buy-Sell Agreement individually, or taken together, establish their right to purchase. The SAC quotes directly from, and refers often to, both documents. *See*, *e.g.*, [*Id.*, ¶¶ 4, 46-51, 53-54].

The Court finds that the Plaintiffs failed to adequately plead that the Plan had a right to purchase the shares. In the codicil, Donald Wood's stated intent is that his estate "take all actions necessary" to sell his shares in a commercially reasonable manner. [DE 63, ¶ 50]; [DE 69-2] (Codicil). The very next sentence expresses a *preference* for the buyer, but nothing more. [*Id.*]. The Buy-Sell Agreement is between Donald Wood and his company, 80/20. [DE 63, ¶ 53]; [DE 66-4, § 2.01(a)] (Buy-Sell Agreement). It provides that upon his death, his estate "shall offer" to the Plan the right to purchase any or all of his shares. [DE 66-4] (Buy-Sell Agreement). The codicil expresses a preference, and the Buy-Sell Agreement outlines the extension of an offer. Neither are a right to purchase. Per the SAC, Plaintiffs injury resulted from fiduciary breaches predicated on the nonenforcement of a nonexistent right to purchase.

As for the right created by the will, Plaintiffs contend that the will directs the sale, and that the following sentence expressing a preference is the appropriate modifier. They argue that the word "preference" has legally binding effect, citing a 1975 Georgia case and a 1956 New Jersey case in support. But the Court is not persuaded. The language of the codicil is clear that above all else, a commercially reasonable sale is desired. [DE 63, ¶ 50]; [DE 69-2] (Codicil). And because the Foundation was the beneficiary of the sale's proceeds, it appears Donald Wood's paramount consideration was the Foundation. He preferred that this be accomplished through a sale to an ESOP, but that was not mandated.[4] Put another way, it's like asking

---

[4] The Court notes here that the will speaks of an ESOP in general terms. The Plan at issue was created six months after the codicil was added to the will. Though the effective date was backdated, Plaintiff never amended the will to specifically name the Plan that was not in existence at the time of will's republication.

someone to buy you ice cream while he or she are at the grocery store: I'd like you to buy me some ice cream; I prefer chocolate, but if they're out of chocolate, vanilla will do. The overriding directive is the purchase of the ice cream. This is no different from the codicil, where the overriding directive is the sale of shares in a commercially reasonable manner. In sum, the codicil did not vest Plaintiffs with an exclusive right to purchase the shares; it bestowed upon the Plan a favorable standing amongst prospective buyers.

Plaintiffs also contend that the Buy-Sell Agreement vested them with a right to purchase the outstanding shares. But the Agreement is between Donald Wood and 80/20, and it provides that upon his death, his shares will first be *offered* to the Plan. [DE 63, ¶ 53]; [DE 66-4, § 2.01(a)] (Buy-Sell Agreement). If the Plan does not buy the shares, and a third party does not buy the shares, 80/20 must then buy the shares. [DE 66-4, § 2.01(a)] (Buy-Sell Agreement). The Plan was only entitled to an offer to purchase upon the death of Donald Wood.

Though the SAC does not specifically mention the Plan's receipt of an offer, it appears from the face of the pleading that one was tendered. Plaintiffs state that upon Donald Wood's death, the Plan and the Estate "began preparing the sale" of the shares. [DE 63, ¶ 64]. Plaintiff also says that the deal "nearly closed in spring 2020." [*Id.*, ¶ 77]. The Court struggles to see how it could accept these allegations as true, yet also determine that Plaintiffs never received the offer to which they were entitled. For the preparation of the sale to be consistent with the Buy-Sell Agreement, as Plaintiffs claim it was, it requires that the offer was considered given as instructed by that document. And it would be difficult for a deal to "nearly close" without an offer being extended. To the extent Plaintiffs had a right, it was to receive an offer upon Donald Wood's

death, and it appears they did.[5] Even considering the preference and the Buy-Sell Agreement together, it does not convert an offer to purchase to a right to purchase.

As for pleading an injury in fact, all is not lost for Plaintiffs. The SAC also alleges that the Plaintiffs' injury was a lost investment opportunity due to Defendant Eagle's dilatory conduct following Donald Wood's death. *See*, *e.g.*, [DE 63, ¶ 10]. If Defendant Eagle was dilatory in taking the necessary steps to respond to the estate's offer to the Plan, and this delay brought the Plan's opportunity to purchase beyond the 180-day timeframe from the Buy-Sell Agreement, Plaintiffs have stated a claim for fiduciary breach. Based on the SAC, it appears that Defendant Eagle's fiduciary breach in that respect increased the probability that the Plan's purchase of any of the outstanding shares would be diminished. If nothing else, earnest negotiations starting beyond the 180-day period meant that third party purchasers could now be introduced. This holds even though Defendant Eagle made two commercially reasonable offers on behalf of the Plan. [*Id.*, ¶¶ 74, 77, 94].

In sum, Plaintiffs have sufficiently plead that Defendant Eagle's conduct constituted a breach of his fiduciary duties, and that there are equitable remedies this Court could order that would redress that injury. As to Claim III against Defendant Eagle under 29 U.S.C. § 1104(a)(1), the motion to dismiss is denied. As to the other claims against Defendant Eagle and the Officer and MPE Defendants, those are dismissed, since no right to purchase existed.

Regardless of standing, the Court would reach the same conclusions on the merits. The injury-in-fact portion of the foregoing analysis demonstrates that Plaintiffs have sufficiently

---

[5] Even after the 180-day period expired, allowing the Estate and Foundation to discuss a sale with third parties, the Plan was given another offer to purchase in the fall of 2020. [DE 63, ¶ 93]. It does not appear from the SAC, the will, or the Buy-Sell Agreement, that this second offer to purchase was necessary. If anything, it appears Defendants did more than what was required of them. The second offer to purchase appears to be a good-faith effort to honor the preference expressed in the codicil.

pleaded that Defendant Eagle breached his fiduciary duties of prudence and diligence when he waited until after the 180-deadline to take steps necessary for the Plan to purchase the shares, and that this late action opened the door for other parties to purchase the shares. The analysis also demonstrates that Plaintiffs did not have a right to purchase the shares, but only a right to receive the offer. Based on the SAC, Plaintiffs have pled that they received the offer, which is all that they were owed. And the Officer Defendants sale to the MPE Defendants was in accordance with the processes laid out in the Buy-Sell Agreement, as well as the preferences stated in the will. The Court fails to see how Plaintiffs have stated a claim as to the actions of the Officer Defendants and the MPE Defendants after the expiration of the 180-day period.

According to Plaintiffs, Defendant Wood and the Officer Defendants engaged in prohibit transactions merely by virtue of wearing multiple hats. This fails to acknowledge the significance of the fact that the residual beneficiary of the will was the Foundation, and that based on the will and the structure of the Buy-Sell Agreement, those interests were paramount. Further, the SAC does not allege facts, beyond the mere positioning of the Officer Defendants, to establish that they engaged in a prohibited transaction. Fiduciaries are allowed to wear two hats. "[T]he trustee under ERISA may wear different hats. … ERISA does require … that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making decisions." *Pegram v. Herdich*, 530 U.S. 211, 225 (2000). The SAC states that after the expiration of the 180-days, when the Estate could seek a third-party buyer, the sale still nearly closed. [DE 63, ¶ 77]. And even though they were not obligated to, the Officer Defendants acted in the best interest of the Plan by soliciting a final offer from it before the Estate and Foundation entered exclusivity agreements with the MPE Defendants. [*Id.*, ¶ 93].

Therefore, Claims I, II, and IV against the Officer Defendants, the MPE entities, and Defendant Eagle as a co-fiduciary, fail because Plaintiffs failed to allege injury-in-fact, as there was no right to purchase, and the SAC alleges actions by the Officer and MPE Defendants that are consistent with the terms of the will and the Buy-Sell Agreement. It is not necessary for the Court to analyze any actions taken 180 days after Donald Wood's death, including any that allegedly breached rights flowing from the purported right to purchase. For the same reasons, the Court does not reach the administrative exhaustion question.[6]

## Conclusion

It is hereby ordered that the Officers and MPE Defendants' Motion to Dismiss [DE 68], is **GRANTED** in its entirety. Defendant Eagle's Motion to Dismiss [DE 65], is **GRANTED in part**, and **DENIED**, **in part**; it is denied as to the 29 U.S.C. § 1104(a)(1) portion of Claim III but granted as to all other claims against Defendant Eagle. In sum, there are still pending claims against Defendant John Wood, who filed an answer, and a breach of fiduciary duty claim under 29 U.S.C. § 1104(a)(1) against Defendant Eagle; all other claims are dismissed.

**SO ORDERED.**

ENTERED: September 30, 2024

/s/ GRETCHEN S. LUND
Judge
United States District Court

---

[6] The Court notes that it has reviewed Plaintiffs' Notice of Supplemental Authority [DE 107]. Because the opinion is provided in relation to the question of administrative exhaustion, and the Court did not address the administrative exhaustion arguments in this matter, it was not discussed in this opinion.